# THE WESLEY CITY COAL COMPANY

## *v.*

## ANN HEALER.

1. MINES AND MINERS—*liability of owners for death caused by want of second escapement.* Where a coal company had opened three coal mines, the first some seventy feet below the surface, the second some sixty-five feet below the first, and the third one hundred and twenty feet below the second, and, though the same had been in operation for about two years, there was no second escapement constructed to the second and third mines, and, while employing more than fifteen laborers in the second mine, a fire occurred in the main shaft, filling the latter mine with smoke, and the miners, in the alarm and confusion consequent on the alarm, rushed to the shaft, and one fell down the shaft into the third mine and was killed, it was *held,* that the company was liable, in an action, to his widow for his death, even though the fire was purely accidental, for the neglect to have a second means of escape.

2. SAME—*party not responsible for negligence caused by alarm.* A party giving another a reasonable cause for alarm can not complain that the person so alarmed has not exercised cool presence of mind, and thereby find protection from responsibility for damages resulting from the alarm, when he is guilty of negligence or violation of law contributing to the injury.

APPEAL from the Circuit Court of Peoria county; the Hon. J. W. COCHRAN, Judge, presiding.

Messrs. COHRS & RIDER, for the appellant.

Messrs. PUTERBAUGH, LEE & QUINN, for the appellee.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

There came into force, on the 1st day of July, 1872, a statute of the State of Illinois, by which, among other things, it was enacted that, "In all coal mines * * * in operation prior to the 1st day of July, 1872, which are worked by or through a shaft, * * * in which more than fifteen miners are employed, if there is not already * * * a communication between * * * said coal mine and some other contiguous mine, there shall be an escapement shaft, making at least two distinct means of ingress and egress for all persons

\* \* \* permitted to work in such coal mine. \* \* \*
Such escapement shaft, or other communication with a contig-
uous mine as aforesaid, shall be constructed in connection with
every vein or stratum of coal worked in such coal mines; and
the time to be allowed for such construction shall be one year
for each one hundred feet in depth of such escapement shaft
so to be constructed, or fractional part thereof. \* \* \*
For any injury to person or property occasioned by any wilful
violations of this act, or wilful failure to comply with any of
its provisions, a right of action shall accrue to the party in-
jured, for any *direct damages* sustained thereby; and in case
of loss of life *by reason* of such wilful violation, or wilful fail-
ure as aforesaid, a right of action shall accrue to the widow
of the person so killed, \* \* \* for a like recovery of dam-
ages for the injuries sustained by reason of such loss of life."

The appellant, in November, 1874, was the owner of mines
called the Hope Mines. These mines, before July, 1872, were
in operation, and consisted of one main perpendicular shaft
communicating with three several veins of coal, the first some
seventy feet below the surface of the earth, the second some
sixty-five to seventy feet lower than the first vein, and the third
some one hundred and twenty feet lower than the second vein.

In November, 1874, the appellant was not working the first
or upper vein, but was working both the second and third veins.
There was an escapement shaft which had been sunk to the first
vein, and which, by the excavations on that plane, communicated
with the main shaft. There was no escapement shaft from
either the second or third vein, and there was no communication
from either of these veins, connecting with any contiguous mine
or mines, and there never had been. The only mode of ingress
and egress to or from the second and third veins was by way of
the main shaft. The second vein was less than two hundred
feet below the surface of the earth, and more than two years
had elapsed since the statute came into force.

In November, 1874, notwithstanding the want of the re-
quired second mode of ingress and egress required by the
statute, the appellant was working, in the second vein, more

than fifteen men, in direct violation of the statute. Appellant was, at the same time, working a number of men in the third vein.

In this condition of affairs, some combustible material in connection with the "up-cast" (or flue provided to conduct the smoke from the furnace operated for ventilation) took fire, and by reason of the burning, a quantity of smoke was produced, and thrown into the main shaft above the second vein. The devices for ventilation were such that, by the currents of air, this smoke was carried (besides to other places) down the main shaft, and through some of the passages and chambers of the second vein, causing great alarm among the miners, and darkening the passages. The miners, generally, rushed to the main shaft, that being the only possible avenue of escape.

The husband of appellee, at that time, was a laborer in the second vein. The evidence tends to show that he, among others, rushed towards the main shaft, in the midst of the general alarm, and that, by reason of the darkness, or from some other cause incident to the affair, he fell down the main shaft to the bottom of the third vein and thus lost his life.

This is an action, brought under that statute, by the widow of the deceased.

Appellant insists that the fire in the "up-cast" was not the result of any fault of the company, and without fault in this respect, appellant can not be charged with the consequences of the fire.

This position is not tenable. The evidence as to whether the fire was purely accidental, or the result of improvidence on the part of appellant, is contradictory, and does not clearly settle that question. But, assuming that the fire was purely accidental, and not the result of any fault on the part of appellant, still, upon the conceded facts of the case, the appellant is plainly liable.

The statute was intended to provide against just such unavoidable accidents in mines, by which many valuable lives had been lost. The company confessedly had failed to construct the escapement shaft required by the statute, and, con-

fessedly, with a full knowledge of the want of any second mode of escape from that vein, continued to work more than fifteen men in that vein. This renders the appellant liable for all direct damages sustained by reason of the want of this second mode of escape. The only remaining question is, whether the death of appellee's husband can properly be said to be one of the direct consequences of the want of an additional escapement shaft. The jury have found, from the evidence, that it was one of the direct consequences, and we think the evidence in this regard fully authorized that finding.

It is said, there was no real danger; that the fire was readily extinguished, and had the men staid at their work, they would have suffered no harm. All this is very true. That, however, is not the hinge on which this question turns. It is equally true that men of ordinary prudence, with a full knowledge that there was but one mode of escape from the mine, hearing a cry of fire, finding the mine filling with smoke, and that from a fire burning in the main shaft, at a point above them and past which they must be carried, if they escape at all, would, ordinarily, be very much alarmed, and, in most cases, lose their ordinary presence of mind. The natural consequence of such a combination of facts would be a rush of the men for the carriage at the main shaft; and, in the smoke and darkness, another very probable consequence would be that some one or more of these men, in this confusion, would, by some misstep, or the jostle of a companion, lose his footing and fall down this shaft.

Had there been a second mode of escape, no such cause of alarm would have existed. Men of ordinary prudence would have felt safe, and been left to exercise their caution in avoiding accidents on their way to a sure mode of escape. It has long been settled, that a party having given another reasonable cause for alarm can not complain that the person so alarmed has not exercised cool presence of mind, and thereby find protection from responsibility from damages resulting from the alarm.

The jury, under the circumstances, may well have found

9—84TH ILL.

that the death was the direct result of the alarm; and that the alarm or fright resulted directly from the want of a second mode of escape.

The law of the case seems to have been correctly stated in the instructions.

We find no sufficient ground to disturb the verdict or judgment.

*Judgment affirmed.*