Filed June 20, 1888.

---

No. 13,003.

THE INDIANA, BLOOMINGTON AND WESTERN RAILWAY COMPANY ET AL. *v.* BARNHART.

SPECIAL VERDICT.—*Requisites of.—Practice.*—In a special verdict, all facts essential to a recovery must be found, to entitle the party having the burden of the issue to a judgment. Facts only are to be found, and conclusions of law contained therein must be disregarded.

LICENSE.—*Acquiescence.—Assumption of Risks by Licensee.*—Where a person has a license to go upon the grounds or the enclosure of another, or uses such grounds with the mere acquiescence of the owner, he takes the

premises as he finds them, and accepts whatever perils he thereby incurs.

NEGLIGENCE.—*Liability of Owner of Land for Breach of Duty.—Implied Invitation.*—Where the owner or occupant of lands, by enticement, allurement or inducement, either express or implied, causes another to come upon such lands, he assumes the obligation of providing for the safety and protection of the person so coming, and becomes liable for any breach of duty in that respect which causes injury to such person, in case such enticement, allurement or inducement amounts to an express or implied invitation, and an implied invitation may be inferred from some act or line of conduct, or from some designation or dedication.

SAME.—*Statutory Obligation.—Liability for Violation of.—Railroad.*—As a general rule, where an obligation is imposed by a statute, it is negligence *per se.* to disregard the obligation thus imposed, and if injury is thereby inflicted, the party disregarding the statute is liable. This rule has peculiar application to the management of railroads and railroad trains.

SAME.—*Statute Construed.— Railroad Crossings.— Liability of Companies for Failure to Repair.*—Under the provisions of sections 3904 and 3905, R. S. 1881, all railroad companies interested in railroad crossings are required to co-operate in maintaining and keeping such crossings in repair, and are jointly liable for an injury resulting from a neglect to observe such statute.

From the Marion Superior Court.

*A. C. Harris, W. H. Calkins, C. W. Fairbanks, B. Harrison, W. H. H. Miller* and *J. B. Elam,* for appellants.

*H. N. Spaan* and *S. M. Bruce,* for appellee.

NIBLACK, J.—This was, when it was commenced, an action against the Indiana, Bloomington and Western Railway Company, the Wabash, St. Louis and Pacific Railway Company, Kingan & Company, Limited, the White River Railroad Company and the Kingan Railroad Company, for an alleged personal injury, but before the cause was submitted to a jury, it was dismissed as to all except the Indiana, Bloomington and Western Railway Company and the White River Railroad Company.

At the request of the plaintiff, the jury were, at special term, directed to return a *special* verdict, which they did accordingly, and which was as follows: .

" 1.  That the Indiana, Bloomington and Western Railway Company is a corporation which, on and about the 12th day of April, 1883, was the lessee and had control of the line of railway built by the Indianapolis, Decatur and Springfield Railway Company, and extending from a place where said line of railway crosses the White river in the western portion of the city of Indianapolis, in an easterly and southeasterly direction, past and just south of a pork house owned by Kingan & Company, Limited.  That said Indiana, Bloomington and Western Railway Company came into possession of said line of railway, as such lessee, on and about the 1st of January, 1882, and has controlled the same ever since.

" 2.  That the White River Railroad Company is a corporation owning and controlling two lines of railway, which, commencing in the private grounds of Kingan & Company, Limited, within said city of Indianapolis, run almost parallel with each other in a south and southeasterly direction, in their course were crossed by the before mentioned line of railway leased and controlled by the Indiana, Bloomington and Western Railway Company ; said place of crossing being situated a little east of south of the place where said parallel tracks run through the gate at the south of the main building of said pork house owned by Kingan & Company, Limited.

" 3.   That the easternmost of said lines of railway belonging to the White River Railroad Company is commonly known as the salt track or switch ; that the westernmost of said tracks or switches is commonly known as the house track.

" 4.  That the place where said salt and house tracks cross and intersect the line of railway leased and controlled by the Indiana, Bloomington and Western Railway Company, is about thirty-five or forty feet south of the gate at the south entrance to the grounds of Kingan & Company, Limited.

" 5.  That the crossing at the point where said salt track

intersects the line of the Indiana, Bloomington and Western Railway Company is what is known as an Elliott crossing; and said lines of railway do not intersect each other at right angles, but at such an angle so that the north rail of the Indiana, Bloomington and Western Railway Company's line of railway, and the west rail of the salt track make an angle where they come together of twenty-five degrees and forty-one minutes.

"6. That the rails of said crossing, including the guard-rails, are straight, and said salt track is straight north of said crossing for a distance of about ten feet, and said salt track is straight south of said crossing for a distance of from ten to fourteen feet.

"7. That said salt track, commencing about ten feet north of said crossing, curves to the east, and said salt track, commencing from ten to fourteen feet south of said crossing, curves to the east and north. That the curve south of said crossing is greater and sharper than the curve north of said crossing.

"8. That said railway crossing is composed of the main rails of said two lines of railway, and guard-rails running parallel thereto and about two and one-half inches from the said main rails. That said guard-rails extend all the distance between the main rails of the Indiana, Bloomington and Western Railway Company's track in a northwesterly and southeasterly direction, and also for a distance of from ten to fourteen feet south of said crossing and for a distance of from ten to fourteen feet north of said crossing.

"9. That the point where the main and guard-rails of said railway companies crossed each other is commonly known as the point of bisection and sometimes as the throat of the frog. That there were four of such points of bisection in this crossing, and were designated as the southwest, the northwest, northeast and the southeast frogs or points of bisection, respectively.

"10. That at these points of bisection the main rails of

said two lines of railway were fastened and bolted together through fish plates, angle irons, and filling between the main and guard-rails.

"11. That the southwest and the northwest points of bisection were loose, some of the bolts which held them together being gone or broken, and said points of bisection having, when cars passed over them, an up and down motion; that the east guard-rail of the salt track was also loose.

"12. That the southwest and the northwest points of bisection, and the east guard-rail before mentioned, were so loose and insecure as to be unsafe for the use to which said crossing was put.

"13. That at the northwest and southwest points of bisection the main and guard-rails of both the defendants in this case came together, and the rails and guard-rails at said points belonging to and controlled by said defendants, respectively, were loose and in an unsafe condition as aforesaid.

"14. That, on the 12th day of April, 1883, both of said defendants, by the exercise of reasonable diligence, could have known of the loose and unsafe condition of the railway crossing aforesaid.

"15. That, on the 12th day of April, 1883, the plaintiff herein was in the employ of the Cincinnati, Indianapolis, St. Louis and Chicago Railroad Company, in the capacity of a locomotive engineer; that upon said day he was in charge of a switch engine, numbered 51; that on or about 5 o'clock in the afternoon of said day he was, with his engine, pulling out of the private grounds of Kingan & Company, Limited, a 'cut' of cars upon the house track aforesaid, and when he had reached, with his engine, a point about four feet north of the track of the Indiana, Bloomington and Western Railway Company, his said engine was run into by a car being backed up upon the salt track aforesaid, by the servants of the Wabash, St. Louis and Pacific Railway Company.

"16. That plaintiff's engine at the time it was struck was moving southeastwardly at the rate of three or four miles

per hour, and the plaintiff was in his proper place upon the right side of his engine, attending to the machinery of said engine; that when his said engine was struck as aforesaid, the plaintiff received great injury, and when he received the same he was in nowise negligent, but was in a place where he had a right to be, and doing what he had a right to do, and he was exercising ordinary care and prudence.

"17. That said plaintiff was with his engine upon said house track at the time he was injured, with the implied consent of the White River Railroad Company, and was proceeding across the track of the Indiana, Bloomington and Western Railway Company upon a signal given to do so by an employee of said last named company, whose duty it was to give such signal.

"18. That the house and salt tracks aforesaid were used by the various railway companies centering in the city of Indianapolis, including the Wabash, St. Louis and Pacific Railway Company, the Indiana, Bloomington and Western Railway Company, and the Cincinnati, Indianapolis, St. Louis and Chicago Railway Company, for the purpose of switching and hauling freight over the same, such as coal, salt, meat, etc., to and from Kingan & Company's, Limited, pork-house, with the implied consent of the White River Railroad Company.

"19. That, upon said 12th day of April, 1883, the servants of the Wabash, St. Louis and Pacific Railway Company were backing up a cut of cars loaded with salt upon the salt track aforesaid; that the hindmost of said cars was loaded with salt, and when it reached the railway crossing aforesaid, said car left the rails of the salt track and ran into the engine under the charge of the plaintiff herein.

"20. That said car left the salt track aforesaid at the northwest bisection of the said railway crossing aforesaid, and it left said track of the defendant because of the loose and un-safe condition of said railway crossing.

"21. That the defendants herein caused, as aforesaid, the

## MAY TERM, 1888. 405

The Indiana, Bloomington and Western Railway Co. *et al. v.* Barnhart.

injuries of which plaintiff complains in this case, by their carelessness and negligence in not keeping the railway crossing aforesaid in ordinary safe condition, but allowed the same to become loose and out of repair.

" 22. That the plaintiff was somewhat acquainted with the crossing at which said car left the track, and knew before said car ran off that said crossing had been allowed to get out of repair by the defendants, and he also knew that said crossing was unsafe for the use to which the same was put.

" 23. We further find that the Wabash cut, at the time it was about to pass over said crossing, was running at a rate of speed of from four to six miles an hour, and that this speed, combined with the unsafe condition of said crossing, as aforesaid, caused said car to leave said crossing.

" 24. We further find that said Wabash cut came onto said crossing without having received a signal from the Indiana, Bloomington and Western watchman to come across said Indiana, Bloomington and Western Railway Company's track.

" 25. That when said car was pushed against the plaintiff's engine it knocked him to the ground and injured him so that ever since he has been unable to do any manual labor; that before the said 12th day of April the plaintiff was a strong, healthy, active man, at that time thirty-nine years of age; that he is permanently injured, and will probably be always disabled so that he can not carry on his usual calling of locomotive engineer, or any other calling that requires physical strength and activity.

" 26. If, upon these facts, the law is with the plaintiff, then we find for the plaintiff against the defendants, the White River Railroad Company and the Indiana, Bloomington and Western Railway Company, and assess his damages at eight thousand dollars.

" 27. And if the law is with the defendants, then we find for the defendants."

When the verdict was returned, each one of the defendants moved for a *venire de novo*, but their motions were both

overruled. Each next moved for a new trial, which was also refused as to both. Each thereupon moved for judgment in its favor upon the special verdict, and both of these motions were likewise denied. Judgment was then rendered in favor of the plaintiff for $8,000 in damages, and that judgment was affirmed at general term.

No such argument is submitted, either in support of the motions for a *venire de novo,* or for a new trial, as is necessary to raise a question for decision in this court. We have, consequently, not considered whether any of those motions ought to have been sustained. But the questions arising, or sought to be raised, upon the matters contained in the special verdict have been ably and exhaustively argued, and are of a character to demand, as they have received, our most careful consideration.

It is contended on the one side, and fully admitted on the other, that facts only are to be found by a special verdict, and that all the facts essential to a recovery must be found to entitle the party having the burden of the issue to a judgment; also, that mere conclusions of law contained in a special verdict are to be disregarded. Such is undoubtedly the law as applicable to a special verdict. *Vinton* v. *Baldwin,* 95 Ind. 433; *Pittsburgh, etc., R. R. Co.* v. *Spencer,* 98 Ind. 186; *Conner* v. *Citizens Street R. W. Co.,* 105 Ind. 62 (55 Am. R. 177); *Pittsburgh, etc., R. W. Co.* v. *Adams,* 105 Ind 151; 2 Tidd Practice, 897.

On behalf of the railroad companies, it is claimed that subdivision No. 14, the last half of subdivision No. 16, the first part of subdivision No. 17, the concluding words of subdivision No. 18, and the whole of subdivision No. 21, of the special verdict, contain mere conclusions of law which, under the rules announced as above, can not be taken into consideration in determining the sufficiency of the facts as found to sustain the judgment appealed from in this cause, and that, with these mere conclusions of law eliminated, the

special verdict was insufficient to entitle Barnhart to have judgment upon it.

The claim thus made, as to what were mere conclusions of law, is, as we believe, well made as to all the enumerated parts of the special verdict except subdivision No. 21, which gave the facts from which the conclusion stated was drawn.

In support of the further claim that the facts as found by the jury were not sufficient to authorize a judgment against either one of the railroads companies, several propositions are urged:

*First.* That neither company owed any duty to Barnhart, he having been only on one of the tracks of the White River Railroad Company as a licensee, merely for his own convenience, and hence not as a matter of right, upon the invitation of either company.

*Secondly.* That there was nothing showing that either one of the railroad companies had notice that the crossings were in a bad condition, and that, for that reason, no negligence could be imputed to either company in permitting such crossings to be out of repair at the time of the injury.

*Thirdly.* That Barnhart was guilty of contributory negligence in the matters which materially led to his injury.

Some of the facts substantially found by the jury are not as clearly and specifically stated, perhaps, as they might have been, but when all that is embraced in the special verdict is carefully considered, we find no difficulty in ascertaining the material circumstances which led to and attended the injury sustained by Barnhart. While nothing can be intended to supply any defect in a special verdict, it is still the duty of the court to take into consideration all that may be plainly and reasonably inferred from the facts that have been found, when declaring the law upon such facts.

It is true, as contended, that the owner of premises is under no legal duty to keep them in good repair for the accommodation of persons who go upon them for their own convenience merely.

Where a person has a license to go upon the grounds or the enclosure of another, he takes the premises as he finds them, and accepts whatever perils he incurs in the use of such license. But when the owner or occupant, by enticement, allurement or inducement, whether express or implied, causes another to come upon his lands, he then assumes the obligation of providing for the safety and protection of the person so coming, and for any breach of duty in that respect such owner or occupant becomes liable for any injury which may result to the person so caused to come onto his lands. The enticement, allurement or inducement, as the case may be, must be the equivalent of an express or implied invitation. Mere acquiescence in the use of one's lands by another is not sufficient. Such an implied invitation may be inferred from some act or line of conduct, or from some designation or dedication.

This general doctrine was affirmed in the case of *Evansville, etc., R. R. Co.* v. *Griffin,* 100 Ind. 221, and is well supported by a long line of authorities. *Sweeny* v. *Old Colony, etc., R. R. Co.,* 10 Allen, 368 ; *Smith* v. *London and St. Katharine Docks Co.,* L. R. 3 C. P. 326 ; *Carleton* v. *Franconia Iron and Steel Co.,* 99 Mass. 216 ; *Toledo, etc., R. W. Co.* v. *Grush,* 67 Ill. 262 ; *Doss* v. *Missouri, etc., R. R. Co.,* 59 Mo. 27 (21 Am. R. 371) ; *Elliott* v. *Pray,* 10 Allen, 378 ; *Stratton* v. *Staples,* 59 Maine, 94 ; *Railroad Co.* v. *Hanning,* 15 Wall. 649 ; *Bennett* v. *Railroad Co.,* 102 U. S. 577 ; *Hayes* v. *Michigan Cen. R. R. Co.,* 18 Rep. 193. See *Lary* v. *Cleveland, etc., R. R. Co.,* 78 Ind. 323 ; *Pittsburgh, etc., R. W. Co.* v. *Bingham,* 29 Ohio St. 364 ; *Jeffersonville, etc., R. R. Co.* v. *Goldsmith,* 47 Ind. 43 ; *Hargreaves* v. *Deacon,* 25 Mich. 1 ; *Nicholson* v. *Erie R. W. Co.,* 41 N. Y. 525 ; *Durham* v. *Musselman,* 2 Blackf. 96 ; *Hounsell* v. *Smyth,* 97 E. C. L. 731 ; *Gillis* v. *Pennsylvania R. R. Co.,* 59 Pa. St. 129 ; *Southcote* v. *Stanley,* 1 H. & N. 246 ; *Bolch* v. *Smith,* 7 H. & N. 736 ; *Lygo* v. *Newbold,* 24 L. & Eq. 507 ; *Burdick* v. *Cheadle,* 26

MAY TERM, 1888. 409

The Indiana, Bloomington and Western Railway Co. *et al. v.* Barnhart.

Ohio St. 393; *Hardcastle v. South Yorkshire R. W. Co.*, 4 H. & N. 67.

The reasonable inference from the pertinent facts found in this cause is, that the two lines of railroad owned by the White River Railroad Company were designed to be, and were in fact, used as mere switches for the purpose of connecting the pork-house of Kingan & Company, Limited, with the various lines of railroad coming into the city of Indianapolis, and of enabling the companies operating such last named railroad lines to haul freight of various kinds over such switch lines to and from such pork-house. The purposes for which these switch lines were seemingly designed, and for which they were permitted to be used, amounted, for the time at least, to a practical dedication of such switch lines to the use of the various connecting railroad lines in the transportation of freight and cars to and from the pork-house of Kingan & Company, Limited. Barnhart was, therefore, at the place at which he was injured upon the implied invitation of the White River Railroad Company. He was also proceeding on his way upon a signal given by, and hence at the express invitation of, the Indiana, Bloomington and Western Railway Company.

Under such circumstances, both companies were under an obligation to provide for his safety and protection while passing over their tracks. As affecting the claim that there was nothing shown from which negligence could be imputed to either one of the railroad companies, it may be said that the general rule is, that where an obligation is imposed by a statute, it is negligence *per se* to disregard the obligation thus imposed, and, if injury is thereby inflicted, the party disregarding the statute is liable. To this general rule there are some exceptions, but there is nothing in the nature of the present case to make it one of the exceptions.

The rule, as stated, has a peculiar application to the management of railroads and railroad trains. Thompson Negligence, pp. 419, 558, 565, 1232, and authorities cited; *Wes-*

*ley City Coal Co.* v. *Healer,* 84 Ill. 126; *Pennsylvania Co.* v. *Hensil,* 70 Ind. 569 (36 Am. R. 188); *Chicago, etc., R. R. Co.* v. *Boggs,* 101 Ind. 522 (51 Am. R. 761).

Sections 3904 and 3905, R. S. 1881, which have been in force since March 7th, 1873, are as follows:

"Section 3904. Where it becomes necessary for the track of one railroad company to cross the track of another railroad company, the company owning the road last constructed at such crossing shall, unless otherwise agreed to between such companies, be at the exclusive expense of constructing such crossing in a manner to be convenient and safe for both companies.

"Section 3905. Whenever such railroad crossing is constructed in the manner provided for in the preceding section, it shall be the duty of each company, respectively, to maintain and keep in repair its own track, so as at all times to provide a ready, safe and convenient crossing for all locomotives or trains passing on either road at such point."

The act of March 7th, 1873, which embraced these sections, contained also the following emergency clause:

"Whereas there is no law now in force upon the subject of keeping railroad crossings in repair, and providing for the expense thereof, an emergency is declared to exist for the immediate taking effect of this act. It shall, therefore, be in force from and after its passage." Acts of 1873, p. 186.

This emergency clause plainly expressed the intention that the provisions of the act on the subject of keeping railroad crossings in repair should apply to all railroad crossings which thereafter might be maintained within the State, and that all railroad companies interested in crossings should be required to co-operate in maintaining and keeping such crossings in proper repair.

As was shown by the eleventh, twelfth and thirteenth subdivisions of the special verdict, two points of bisection at the crossing made by the salt track belonging to the White River Railroad Company, and the line of the Indiana,

Bloomington and Western Railway Company, were badly out of repair at the time of the collision which injured Barnhart. These bisections had in fact lost their fastenings and had been permitted to become loose, insecure and unsafe. This condition of things was allowed to exist at the peril of the railroad companies owning the tracks, and, being in violation of the provisions of a statute, was, in the abstract sense, negligence *per se* on the part of such companies. As was further shown by the twentieth and twenty-first subdivisions of the special verdict, it was this loose, insecure and unsafe condition of one of the bisections and consequent defective state of the crossing which caused the cars of the Wabash, St. Louis and Pacific Railway Company to leave the track and to collide with the engine in charge of Barnhart. Since, for the reason given, both of the railroad companies now before us owed to Barnhart the duty of providing for his safety while he was engaged upon their tracks in the service of his company, the subdivisions of the special verdict, lastly above referred to, established a cause of action against these companies, unless Barnhart was guilty of contributory negligence.

As has been seen, the twenty-second subdivision of the special verdict found that Barnhart was somewhat acquainted with the crossing at which the car, which injured him, left the salt track, and that he knew before the car ran off that the crossing at that point had been allowed to get out of repair by the companies to which it belonged; also, that he knew that the crossing was unsafe for the purpose for which it was used. From this it is argued that Barnhart was guilty of contributory negligence in going upon either one of the tracks of the White River Railroad Company ; that in doing so he voluntarily assumed the risk of a danger which he knew existed, and thus forfeited all right to compensation for any injury which might result to him from his going on to either one of such tracks.

This argument leaves entirely out of view the fact that no

defect was shown to exist either in the "house track," which Barnhart was using, or in the crossing over which he was endeavoring to pass when he was hurt. For aught that was made to appear, that track and that crossing were at the time both in good condition, and we must assume that they were. Nor was any thing found indicating that there was any direct connection between the two White river railroad tracks, or that the use of one involved any responsibility for the use or misuse of the other.

Considered in connection with the business which Barnhart had in hand, it was wholly immaterial to him whether the crossing on the "salt track" was in good or in bad condition. He had not been, and was not aiming to go, upon that track at the time of the collision. His knowledge, therefore, of the unsafe condition of the "salt track" was a matter entirely collateral to, and wholly disconnected with, the work in which he was engaged on the "house track." The contingency of a car breaking away from the "salt track" and running over on to the "house track" was one which could not have been reasonably anticipated, and was hence not an occurrence against which Barnhart was required to be on his guard.

As we construe the relative situation of affairs at the time Barnhart was thrown from his engine, he was not guilty of contributory negligence.

The judgment is affirmed, with costs.

Filed March 20, 1888; petition for a rehearing overruled July 10, 1888.