NEW JERSEY, INDIANA AND ILLINOIS RAILROAD COMPANY
*v.* NEW YORK CENTRAL RAILROAD COMPANY.

[No. 11,794.   Filed January 14, 1925.   Rehearing denied June 2, 1925.
Transfer denied April 23, 1929.]

*Jones, Montgomery & Obenchain,* for appellant.
*Bertrand Walker, John Gavit* and *John G. Yeagley,* for appellee.

This action was instituted by the New York Central Railroad Company against the New Jersey, Indiana and Illinois Railroad Company to recover for work and labor done and for materials furnished and used in the maintenance and replacement of a railroad crossing pursuant to a written contract. A demurrer to the complaint on the ground that it did not state facts sufficient to constitute a cause of action was overruled. The defendant refused to answer, and judgment was

rendered for the plaintiff in the sum of $914.18.

The essential facts averred in the complaint are embodied in the following statement:

"For many years prior to the execution of the contract which is the foundation of the action, the Indiana, Illinois and Iowa Railroad Company (hereinafter called 'the Iowa company') owned and operated a railroad which extended southward from the city of South Bend and connected with the Wabash Railroad at Pine, Indiana. In January, 1905, the New Jersey, Indiana and Illinois Railroad Company (hereinafter called 'the New Jersey Company') was engaged in the construction of its road; and, in order that it might proceed on the line which it had selected for that purpose, it became necessary to cross the right of way and tracks of the Iowa company at a place in Portage township, St. Joseph county. At the place of the proposed crossing, the Iowa company held the title to its right of way by purchase. These two companies entered into a written contract, by the terms of which, the Iowa company granted to the New Jersey company the right to construct, maintain and use not to exceed two tracks upon and across the right of way and tracks of the Iowa company, at a common grade. The contract further provided that all crossings in the tracks of the Iowa company should be furnished and maintained by the Iowa company and the cost of construction and maintenance should be borne by the New Jersey company, bills therefor to be rendered monthly by the Iowa company, and to be paid within sixty days by the New Jersey company.

"Immediately after the execution of the contract, the New Jersey company entered upon the right of way of the plaintiff's predecessor in title, under and by virtue of the contract and not otherwise, and constructed its crossing over and upon the tracks of the Iowa company

at a common grade and at the place designated in the contract.

"In April, 1914, pursuant to certain consolidation proceedings, the plaintiff acquired the railroad property which formerly belonged to the Iowa company and acquired all the right and interest of the Iowa company in and to the contract aforesaid.

"The defendant has never acquired the right to cross the tracks and right of way of the plaintiff by condemnation proceedings nor in any manner other than by virtue of the contract; and neither the plaintiff nor its predecessors in title have ever received any consideration therefor except as provided in the contract.

"Since its construction, the crossing has been continuously maintained and used as a railroad crossing, and is now maintained and used as a railroad crossing over which the trains of the defendant and the trains of the plaintiff pass in the daily operation of their respective roads. Since the construction of the crossing, the plaintiff and its predecessors in title have repaired and maintained the crossing in accordance with the terms of the contract, and have rendered from time to time bills therefor to the defendant for the labor and material occasioned thereby, as provided in the contract; and the defendant, on all occasions and at all times, save and except as hereinafter averred, has paid the bills so rendered.

"Pursuant to the terms of the contract, in the month of May, 1921, the plaintiff furnished labor, repairs, and material and expended money in maintaining the crossing, which were of the fair and reasonable value of $1,828.37, a bill of particulars of which is filed herewith and made a part hereof as 'Exhibit A.' A statement of the work, repairs and material and money expended as aforesaid was rendered to the defendant, as provided in the contract, and the defendant has refused to pay the amount thereof and denies liability for the payment

thereof. The defendant has paid and the plaintiff has accepted, without prejudice to the rights of either party, one-half of said sum, leaving a balance due the plaintiff from the defendant in the sum of $914.17, which sum is now due and unpaid, and which sum the defendant refuses to pay and denies liability for the payment thereof. More than sixty days has elapsed since the plaintiff rendered to the defendant its itemized account as aforesaid.

"The plaintiff and its predecessors have at all times kept and performed all the conditions of the contract to be performed by it and its predecessors.

"At the crossing involved herein, the tracks intersect at right angles, or nearly so. At each of the four corners of the crossing, the steel rails are cut and separated, in order to furnish an open space through which the wheel flanges pass; and, at each corner, the rail of either track is securely bound to the converging rail of the other track, by a rectangular piece of steel (or iron) fastened to both rails by bolts. The cross-rails are made firm by fastening each of them to a heavy piece of steel (or iron) by bolts; and attached to either end of each cross-rail is a rail of considerable length, commonly called a 'guard rail,' and each guard rail is securely fastened by bolts to the regular rails. Within the square formed by the four cross-rails is a rectangular quadrangle made of heavy steel (or iron) and commonly known as a 'crossing-frog.' The crossing-frog is securely fastened to the cross-ties. Ordinary cross-ties are eight feet and six inches in length and are laid at right angles to the steel rails. The ties under the crossing are, and are required to be, about seventeen feet in length and are, and are required to be, laid diagonally, in order to give effective support to the trains of either company.

"The construction of the crossing is of such a character

that it is impossible for either company to repair and maintain any separate part or portion thereof. The plaintiff cannot repair or replace its own track at the crossing without at the same time repairing and replacing the defendant's track; nor can the defendant repair or replace its track at the crossing without at the same time repairing or replacing the plaintiff's track."

The assignment of error challenges the ruling on the demurrer.

Dausman, C. J.— (after making the foregoing statement).

There is no contention that the entire contract is void. The only contention is that the provision of the contract which stipulates that the Iowa company shall make all needful repairs from time to time and that the cost thereof shall be paid by the New Jersey company is void on the ground that it is violative of the policy of the state as declared by statute. It is conceded that, in all other respects, the contract is valid and binding upon the parties to this appeal.

The proposal of the New Jersey company to construct its road across and upon the road and right of way of the Iowa company was a matter of no light concern to the latter company. In addition to the taking of its property, the construction and maintenance of a crossing would impose upon it a perpetual burden. The existence of the crossing naturally would increase the hazards inherent in the operation of its trains. It not only had a right to protect its own property, but it was its duty to exercise due care for the safety of the passengers and property to be transported on its trains, and for the safety of its servants while operating its trains. *Evansville, etc., Traction Co.* v. *Evansville Belt R. Co.* (1909), 44 Ind. App. 155, 87 N. E. 21; *Baltimore, etc., R. Co.* v. *Cincinnati, etc., R. Co.* (1912), 52 Ind. App. 639,

99 N. E. 1018. In view of these considerations, it is manifest that it would be entitled to adequate compensation.

The New Jersey company had no absolute right to cross the Iowa company's right of way. Its inchoate right so to do could have been perfected by complying with certain requirements. The first step in the process was to institute negotiations with a view to an adjustment of compensation and other details by agreement. Had it failed in that, then the second and final step would have been to institute a condemnation proceeding; and, in that event, the compensation (in the nature of damages) must have been ascertained and paid in advance. State Constitution, Art. I, §21; §928 *et seq.* Burns 1914; *Lake Shore, etc., R. Co.* v. *Cincinnati, etc., R. Co.* (1889), 116 Ind. 578, 19 N. E. 440.

When the representatives of the railroad companies met for the purpose of negotiating an agreement, naturally a number of elements must have arisen for their consideration. None of those elements was of greater importance to the companies than the crossing proper. Who shall construct the initial crossing? What type of crossing shall be constructed? Who shall have authority to renew from time to time the tracks at the place of intersection? Who shall pay the cost of keeping the crossing constantly in a serviceable and safe condition? That these elements were legitimate subjects for discussion and settlement, we apprehend no rational person will deny. Indeed, it is inconceivable that there could be a full and fair determination of the whole matter without settling the rights of the parties in respect to these inherent elements. Was it lawful for the parties to settle these things by agreement? Their right to contract concerning their property will not be abridged except for grave and weighty reasons. *Callicott* v. *Allen* (1903), 31 Ind. App. 561, 67 N. E. 196;

*Moon* v. *School City, etc.* (1912), 50 Ind. App. 251, 98 N. E. 153; *Burley Tobacco Society* v. *Gillaspy* (1912), 51 Ind. App. 583, 100 N. E. 89; *Hogston* v. *Bell* (1916), 185 Ind. 536, 112 N. E. 883; 13 C. J. 427, and cases there cited; 6 R. C. L. 710, and cases there cited. It is manifest that nothing but a statutory inhibition, resting on the ground of public policy, can justify a court in holding that they did not have the right to settle all or any of the aforementioned elements by agreement

In the year 1873, the Legislature enacted the following statute:

"Section 1. *Be it enacted by the General Assembly of the State of Indiana,* That where it becomes necessary for the track of one railroad company to cross the track of another railroad company, the company owning the road last constructed at such crossing, shall, unless otherwise agreed to between such companies, be at the exclusive expense of constructing such crossing in a manner to be convenient and safe for both companies.

"Sec. 2. Whenever such railroad crossing is constructed in the manner provided for in the first section of this act, it shall be the duty of each company, respectively, to maintain and keep in repair its own track, so as at all times to provide a ready, safe and convenient crossing for all locomotives or trains passing on either road at such point." Acts 1873 p. 186, §§5222, 5223 Burns 1914, §§12953, 12954 Burns 1926. On the foregoing statute, the appellant rests its contention. Does the statute constitute a firm foundation?

When making a critical examination of the act for the purpose of discovering the legislative intent, the first thing to observe is its scope—what is included and what is excluded. It clearly appears that the applicability of the act is not limited to any particular kind of crossing, in respect to physical structure. All crossings, regardless of the type of construction, are within its purview.

It is immaterial that a proposed crossing is to be an overhead, a subway, or a grade crossing; for all alike are subject to the provisions of the act. *Indiana, etc., R. Co.* v. *Barnhart* (1888), 115 Ind. 399, 16 N. E. 121. The one and only limitation is in another direction. It is apparent that the effect of the words "unless otherwise agreed to between such companies" is to leave the companies free to determine by agreement which company shall construct the initial crossing and which company shall pay the cost thereof, or whether the cost shall be divided between them in any proportion satisfactory to themselves. That proposition is too plain for argument. How, if at all, do the words "unless otherwise agreed to between such companies" affect §2 of the act? Does the limitation expressed by those words hold good as to §2? In view of the contention presented by the appellant, we must look beneath the surface to find the true meaning and purpose of this peculiar piece of legislation.

As we have seen, the law not only leaves railroad companies free to agree on the element of compensation; but it imperatively requires, as a condition precedent to the right to maintain a condemnation proceeding, that an effort to agree thereon must have been made. The law leaves them free to agree on the kind of crossing to be constructed—whether it is to be on a separate or at a common grade. §5227 *et seq.* Burns 1914. By the plain words of the act of 1873, they are free to determine by agreement who shall pay the cost of constructing the initial crossing. Why, then, should they be prohibited from making an agreement concerning the cost of maintaining the crossing?

It is not unreasonable to say that the State has a substantial interest in the physical character of railroad crossings, for the safety of life and property is directly involved in that feature. The Legislature has recognized that interest by providing a method whereby the physi-

cal character of a crossing shall be determined in cases where the companies are unable to agree. §5227 *et seq., supra.* But the important fact remains that the Legislature has not seen fit to prohibit railroad companies from fixing by their agreement the physical character of any crossing—whether it shall be at a common grade or at separate grades.

Can it be that the Legislature was concerned only with the effect that agreements concerning the expense of maintenance might have on the financial affairs of railroad companies? If the State has any interest in that feature, it is remote and shadowy. It is inconceivable that the Legislature was impressed with the idea that the State had such an interest in the financial feature as would justify it in denying the natural right to contract. Whether the cost of maintaining a crossing should be paid wholly by one company or should be divided (equally or unequally) between the two, is a question which directly concerns the companies; but whatever interest, if any, the State may have in that question is indirect and apparently inconsequential. It would be unreasonable to say that the legislative purpose was directed to that purely financial feature. When the statute was enacted, neither the Legislature nor Congress had undertaken to regulate or control the financial affairs of railroad companies; and it is not within the range of probability that the Legislature was concerned in that phase of the subject. The reference to the expense of maintenance is merely incidental to the main purpose.

Obviously, the real purpose of the act was not to impose on each company the naked duty to maintain its own track which would, of course, be the duty of every railroad company in the absence of legislation. To so hold would be to charge the Legislature with stupidity. Self-interest should be sufficient

to insure the performance of that duty; for no road is likely to be profitable unless a continuous track is maintained between the final terminals. But *how* (in respect to physical conditions) should a railroad be constructed and maintained where it crosses another road? It is conceivable that the company whose duty it is to construct the initial crossing, prompted only by its own selfish interests, might propose to construct a crossing which would be suitable to its own purposes but quite unsuitable to the purposes of the other company. It is also conceivable that, after a crossing consonant with the needs of both companies has been constructed, either company, through the selfishness, indifference or thoughtlessness of its officers, may maintain its own track in a condition fit for its own purposes but which nevertheless constitutes a menace or an obstruction or a hindrance to the other company. In other words, although its own track is in perfect condition for its own purposes, nevertheless it may be in a condition which renders the place of crossing unready, unsafe and inconvenient for the passage of the locomotives and trains of the other company. Here we come to the very heart of the act. The essential purpose of §1 is evidenced by the declaration that the initial crossing shall be constructed "in a manner to be convenient and safe for both companies." The essential purpose of §2 is evidenced by the declaration "that it shall be the duty of each company, respectively, to maintain and keep in repair its own track, so as at all times to provide a ready, safe and convenient crossing for all locomotives and trains passing on either road at such point." The true purpose of the act is to require that each company, at all times and in all respects, shall exercise its own rights and care for its own interests in the crossing with due and proper regard for the rights and interests of the other company. *Indiana, etc., R. Co.* v. *Barnhart, supra.* That duty is not limited by the

words "unless otherwise agreed to between such companies." The sole function of those words is to express the legislative recognition of the right of the interested companies to agree otherwise *concerning the expense and concerning who shall do the actual work*.

The duty imposed by the act is readily understandable in cases where the two roads are constructed on separate grades. But how is the act to be applied in the case of a grade crossing—where the roads are constructed at a common grade? As to the type of grade crossing in common use at the time the statute was enacted, the court is not informed. It is clear, however, that the Legislature had in mind crossings so constructed that each company could maintain its own track separately and independently of the other track. At this point, the suggestion arises spontaneously that perhaps the word "track" is used in a narrow sense and signifies nothing more than the steel rails. (See "track," Century Dictionary). But even if the word be taken in that sense, what is gained? How are the rails to be properly maintained without a proper roadbed and proper crossties to support them?

▪ The modern grade crossing, designed to insure the highest degree of safety, is not constructed on a plan that leaves each track disconnected and independent of the other, so that each company can maintain its own track without affecting the other. To compel each company to maintain its own track at the crossing, wholly independently of the other track, would necessarily prohibit the use of modern crossings and force the use of an inferior contrivance which would be a constant menace to the safety of its trains. Surely, it will not be said that the Legislature has declared a policy that would prohibit the use of the best that engineering skill can devise to insure safety in the transportation of passengers and freight by rail. The truth is that the modern

crossing is a structural unit, and must be maintained as a unit. The logical inference is that it would be advantageous to the companies directly interested and to the public to have the actual work of repairing a crossing —leveling up and filling depressions in the roadbed, substituting good cross-ties for decayed ones, replacing a broken frog with a sound one, laying new rails, and doing whatever else may be necessary from time to time to keep the crossing safe and convenient for both companies—under the direction and control of one company. It follows that the declaration in §2 that "it shall be the duty of each company, respectively, to keep in repair its own track," if taken literally, is utterly inapplicable to a modern grade crossing—a crossing of the kind described in the complaint. As between the companies and the public, the duty rests on each company to see that the crossing *as an entirety* is maintained at all times in a condition to constitute a ready, safe and convenient crossing for both companies. That duty arises out of the necessity for prompt and safe transportation by rail, and cannot be evaded by contract. As between themselves, however, the companies are free to settle by their agreement which of them shall have charge of the actual work of making repairs and whether the cost thereof shall be paid by one of them or divided between them.

The contract is not a device to enable either company to escape the duty it owes the public. On the contrary, the purpose of the contract, in so far as the public is concerned, is to fulfill, not to evade. Why should that duty not be discharged through a contract? The duty rests upon every railroad company to fence its right of way; and the public has a direct interest in that duty. Would anyone contend that the duty to fence may not be discharged through a contract? The duty rests upon a city to keep its streets in a reasonably safe condition for public travel; but it is a familiar fact that the Legis-

lature has expressly authorized municipalities to discharge that duty through contractors. Nor do we perceive any justification for the argument that the existence of the contract tends to lessen the vigilance of the New Jersey company in the matter of inspection and to diminish its desire to have the crossing kept constantly in a state of high efficiency. If it be said that, because the one company has contracted to pay the bills, naturally it would not care to have repairs made with much frequency, the answer is that, by the same token, the zeal of the other company for repairs would be correspondingly intensified. But, since there are no facts by which to test the argument, that feature must be regarded as too speculative and uncertain to serve as a foundation for a public policy which involves a denial of the natural right to contract. However, the probability is that, because of the contract, the crossing will be kept in good repair with greater certainty and less bickering than if a new arrangement had to be made every time repairs are needed.

We conclude that the trial court did not err in its ruling on the demurrer. It is urged, however, that, to reach this conclusion, we must necessarily create a conflict with certain decisions heretofore rendered in this jurisdiction. Those decisions we will now examine.

In *Pittsburgh, etc., R. Co.* v. *Ft. Wayne, etc., Trac. Co.* (1923), 193 Ind. 405, 138 N. E. 759, it appears that the Fort Wayne company repaired the crossing pursuant to a request of the Pittsburgh company. It was held that the Fort Wayne company was entitled to recover one-half the cost of repairs on an implied contract. There is nothing in that case which in any manner conflicts with the decision in the case at bar.

In *Indiana, etc., R. Co.* v. *Barnhart, supra,* the action was against the two companies whose roads crossed, to recover damages for a personal injury resulting from

the failure to keep the crossing in good repair. It was held that the companies were jointly liable. Nothing in that opinion conflicts with the opinion in the case at bar.

In *Vandalia R. Co.* v. *Fort Wayne, etc., Trac. Co.* (1918), 68 Ind. App. 120, 118 N. E. 839, a contract similar in its terms to the contract involved in the case at bar was held invalid on the following grounds: (1) That there was no consideration; and (2) that it was violative of a statute similar to the one involved in the case at bar (§5676 *et seq.* Burns 1914). What was said on the question of consideration does not now concern the court, for there is no question of consideration in the case at bar. Whether what was said on the subject of public policy is sound or unsound, we need not now determine; for the reason that, while that feature of the case resembles the public policy feature of the case at bar, nevertheless there is a pronounced difference in the essential facts. The time to review the Vandalia case for the purpose of sustaining or overruling it on the question of public policy will be when a case arises in which the facts are identical in their essential features.

In *Union Traction Co.* v. *Ross, Rec.* (1919), 71 Ind. App. 473, 125 N. E. 72, and in *Terre Haute, etc., Traction Co.* v. *Ross, Rec.* (1923), 84 Ind. App. 697, 138 N. E. 90, wherein the essential facts are identical with the essential facts in the Vandalia case, the court followed the Vandalia case. What we have said concerning the Vandalia case is applicable to each of the cases now under consideration.

Judgment affirmed.