EDWARD STEWART v. THE CINCINNATI, WABASH & MICHIGAN RAILWAY COMPANY.

[See 80 Mich. 166.]

*Railroad companies—Farm crossings—Negligence—View by jury.*

1. The granting of a motion in a negligence case that the jury view the premises where the accident occurred is within the discretion of the court, which is not abused by the denial of such motion where the trial is had two years after the accident, and the testimony shows that the condition of the premises is changed.

2. A railroad company claimed to have abandoned a farm crossing over its track at the time of an accident caused by its alleged non-repair, and on the trial of a suit brought by the injured party to recover the consequent damages it became a material question whether the defendant recognized the crossing at the time of the accident, and whether the circumstances were such from the appearances that the plaintiff was invited to use it, as a crossing. It appeared from the testimony of defendant's witness that a short time before the accident there were two planks between the rails at said crossing. And it is held that

the plaintiff might show the custom of defendant in relation to farm crossings, and its instructions to its trackmen as to keeping them in repair, in order to prove that it did maintain the crossing in question at the time of the accident.

8. A railroad company which fails to remove a farm crossing constructed for an adjoining land-owner under an agreement binding only on the contracting parties, after its termination, and continues it as a crossing, is obligated to use ordinary care to see that the crossing is not dangerous, while so continued, to those who accept the invitation to use it for the purposes for which it is maintained.

Error to Berrien. (O'Hara, J.) Argued October 14, 1891. Decided December 22, 1891.

Negligence case. Defendant brings error. Reversed. The facts are stated in the opinion, and in 80 Mich. 166.

*George S. Clapp* and *C. E. Cowgill,* for appellant.

*Edward L. Hamilton* and *O. W. Coolidge,* for plaintiff.

CHAMPLIN, C. J. In addition to the facts stated in our former opinion (80 Mich. 166), the defendant introduced testimony which tended to show that the ditch over which the bridge was constructed at that time was about four feet in width, and that in 1887 a freshet carried off several feet of the planks of the bridge, together with some of the stringers, and left them a short distance to the west. Defendant also introduced testimony tending to show that none of the servants of the defendant were directed to replace the bridge, and the witnesses sworn did not know who did replace it, but it was repaired by some one, if it had been carried away, in the summer of 1887. Defendant also introduced testimony tending to show that when the bridge was first constructed, in 1882 or 1883, it was so constructed as to make a safe and sufficient bridge for the purpose

intended, and that the stringers were composed of timber that would last without material decay from five to seven years. A portion of one of the stringers was produced upon the trial, and showed that it was decayed and rotten entirely through, so that its life and strength were gone.

The plaintiff combated the claim that the bridge had been carried away or so injured by a freshet in 1887, and introduced testimony to rebut that of the defendant upon that point, and it was left a disputed question of fact to be settled by the jury.

The principles laid down when the case was here before confined the issue to be tried to narrow limits. It was then said that the only duty that the defendant owed to plaintiff was that of the owner of premises, to see that they were in a condition which would not endanger the safety of third persons lawfully there. To this end it was competent to show that defendant, or those whose duties and obligations it had assumed, erected the bridge complained of in the first instance, and whether it was obliged to maintain and keep it in repair by any contract with the owner of the adjoining land was not important in this suit; the main question being, was it a dangerous structure, either through a faulty construction or decay and want of repair, and were the circumstances and surroundings such that the jury might infer that the plaintiff was invited to pass over the structure under the belief that it was in a safe condition to be used for the purposes for which it was erected? It was also a prerequisite to the recovery that the plaintiff should make it appear to the jury that he did not in any manner contribute to the injury which he received, through any negligence of his own.

Forty-two errors are assigned and urged as reasons for a reversal of the judgment.

The first error assigned relates to the overruling of the defendant's motion to have the jury view and inspect the location and premises at which the injury occurred. The matter was in the discretion of the trial judge, and when it is remembered that this trial occurred in 1890, and the accident in 1888, and the testimony shows that the premises are not in the same condition which they were in at the time of the accident, it was not an abuse of the discretion reposed in the circuit judge to deny the motion.

I discover no error in the rulings of the court upon the introduction of the testimony. This disposes of the errors assigned from the second to the thirteenth, inclusive.

Witnesses were permitted, against defendant's objection, to testify to the custom of the defendant company in relation to farm crossings, and inquiries were directed to the point as to what instructions the trackmen had received as to keeping farm crossings in repair. It was claimed that this testimony was irrelevant to the issue, and detrimental to the defendant. The defendant had proven that the railroad track crossing the land purchased from Kent had been raised about 18 inches, as tending to show that this crossing was not regarded as of any use, and was in effect abandoned. The testimony of defendant's witnesses tended to show that their instructions were to, and they always did, keep the planks between the rails at such crossings spiked down; that otherwise they were a source of danger; and also that the defendant's servants usually removed the planks between the rails in the fall or upon the approach of winter, and replaced them in the spring. One of the defendant's witnesses testified that a short time before the accident there were two planks between the rails at the crossing in question. Now, as it was a material ques-

tion whether the defendant recognized the crossing at this point at the time of the accident, and whether the circumstances were such from appearances that the plaintiff was invited to use it as a crossing, it was proper to consider what the instructions and custom of defendant's officers and servants were with reference to farm crossings in order to prove that it did maintain this crossing at the time. If such was their custom, and these planks were there between the rails at the time, it would tend to prove that the company recognized it as an existing crossing, notwithstanding it had raised the road-bed, and notwithstanding the claim that the bridge had been washed away by a freshet, and it had never replaced it. There was no error in admitting such testimony.

The defendant's counsel requested the court to charge, and he did charge as requested, as follows:

"If the appearance of this crossing, with its approaches and immediate surroundings, was such as to indicate to an ordinarily prudent man that he ought not, in the condition it was in, drive upon it with a two-horse team and wagon, and the wagon loaded with wood, the plaintiff cannot recover.

"If the plaintiff, by failing himself to make a proper examination of said bridge before driving upon it, or if in any particular he was negligent, and such negligence contributed to his injury, the plaintiff cannot recover, and your verdict should be for the defendant.

"If the appearance of this bridge, with its approaches and immediate surroundings, was such as to indicate to a man of ordinary prudence that he should examine as to its safety before attempting to cross it, and if you find the plaintiff made no such examination, and that his failure so to do contributed in part or in any way to his injury, the plaintiff cannot recover."

Several requests presented by defendant's counsel were refused. Some of them were not applicable to the issue then being tried, and others were covered by the general charge of the court made to the jury upon his own motion.

The defendant's counsel requested the court to charge the jury that—

"The defendant was under no obligation to the plaintiff under this agreement made with Warner, and which has been read in evidence, to repair or maintain this bridge in question; and the agreement is to be considered by you for no other purpose than as showing whether or not the defendant constructed the bridge in the beginning."

This request was refused. I think, as the request was presented, it was properly refused, for the reason that another purpose for which it was admissible to consider the agreement was that if the bridge was built under the agreement, and the defendant had continued in fact to maintain a crossing there, it was competent upon the point that the plaintiff was lawfully upon the premises.

It was strenuously urged by counsel for defendant that the agreement amounted to a mere license to cross the railroad, and at the most, if there was such a crossing at the point of 'accident as could be used by plaintiff, and from which an invitation or permission to cross the track at that place could be inferred, still plaintiff was a mere licensee, and the company owed him no duty to keep the crossing in repair for his use and benefit, but that he took his own risk in acting upon the license. The point raised is an important one, and the answer to it must determine the liability of defendant to plaintiff.

What is a "license," as relating to the occupation or use of real estate? In *Morrill v. Mackman*, 24 Mich., at page 282, this Court said:

"A license is a permission to do some act or series of acts on the land of the licensor, without having any permanent interest in it. [citing cases]. It is founded on personal confidence, and therefore not assignable. 3 Kent, Comm. 452; Browne, Stat. Frauds, § 22. It may be given in writing or by parol; it may be with or without consideration; but in either case it is subject to revoca-

tion, though constituting a protection to the party acting under it until the revocation takes place. Where nothing beyond a mere license is contemplated, and no interest in the land is proposed to be created, the statute of frauds has no application, and the observance of no formality is important. But there may also be a license where the understanding of the parties has in view a privilege of a less precarious nature. Where something beyond a mere temporary use of land is promised; where the promise apparently is not founded on personal confidence, but has reference to the ownership and occupancy of other lands, and is made to facilitate the use of those lands in a particular manner and for an indefinite period, and where the right to revoke at any time would be inconsistent with the evident purpose of the permission; wherever, in short, the purpose has been to give an interest in the land,—there may be a license, but there will also be something more than a license, if the proper formalities for the conveyance of the proposed interest have been observed. What that interest shall be called in the law may depend upon the character of the possession, occupancy, or use the promisee is to have, the time it is to continue, and perhaps upon the mode in which the compensation, if any, is to be made therefor. It may be an easement or it may be a leasehold interest; or, if the proper grant or demise has not been executed for the creation of either of these, the permission to make use of the land may still constitute a protection to the party relying upon it, until withdrawn."

The agreement in this case was made to facilitate the use of the land through which the railroad runs, severing it into two parcels. It was for an indefinite period, and the right to revoke it would be inconsistent with the evident purpose of the permission implied in the agreement. As between the parties to the agreement, there is implied a right to cross the railroad, and it means something more than a license. Nor was the plaintiff a mere licensee or trespasser in passing over the crossing. In this case it is contended by the defendant that the agreement was personal, and was binding only between the

89 MICH—21.

railroad and the owner, and did not contain any cove-
nants which ran with the land; and, moreover, it was an
agreement to construct, and not to maintain.    Conceding,
without deciding, that this contention is correct, it fol-
lows that when Kent conveyed to Green on March 15,
1884, the obligation of the railroad company with respect
to the crossing it had erected for Kent terminated, and
it was at liberty to remove the structure at pleasure; but
it did not remove it, but continued it as a crossing; and
as long as it did so, it was obligated to use ordinary care
to see that it was not dangerous to those who should
accept the invitation to use it for the purposes for which
it was maintained.

The difference between a license and an invitation to
come upon or cross the lands of an owner or occupier is
pointed out in the case of *Nichols' Adm'r v. Railroad Co.*,
83 Va. 99 (5 S. E. Rep. 171).    That was an action of
tort.    The railroad company had permitted the public to
travel across its grounds in a path which led across its
switch.    It had been the invariable custom of the agent
at the depot to part the freight-cars immediately after
they were placed upon the switch, to allow the people
to pass.    The plaintiff's intestate, in passing between the
cars to meet a brother at the depot, who was expected
on the train, was crushed and killed by the sudden
backing of the engine, which brought the cars together.
In deciding that case, the court said:

"Now, it is agreed on all hands that there is a wide
difference between the obligation which a person or cor-
poration owes to a mere licensee, and the duty which the
same person or corporation owes to one who comes upon
his premises by an invitation, either expressed or implied.
In the first case it is generally admitted that the party
comes at his own risk, and enjoys the license subject to
its concomitant risks or perils, and that in such case no

duty is imposed upon the owner or occupant to keep his premises in safe and suitable condition for his use, and the owner or occupant is only liable for any wanton injury that may be done to the licensee. *Hounsell v. Smyth*, 7 C. B. (N. S.) 731; *Barnes v. Ward*, 9 C. B. 392; *Hardcastle v. Railway Co.*, 4 Hurl. & N. 67; *Binks v. Railway Co.*, 3 Best & S. 250; *Bolch v. Smith*, 7 Hurl. & N. 741; *Sweeny v. Railroad Co.*, 10 Allen, 375; *Carleton v. Steel Co.*, 99 Mass. 216; Pierce, R. R. 274. On the other hand, the law imposes an obligation on the owner or occupant to provide for the security against accident and injury of those he has invited or induced to come upon his premises, by such an adaptation and preparation of his place for their reception and use as would naturally lead them to suppose that they might properly and safely enter thereon. Accordingly it has been generally held that where the owner or occupier, either directly or by implication, induces persons to enter on and pass over his premises, he thereby assumes an obligation that they are in safe condition, suitable for such use, and for a breach of this obligation he is liable in damages to a person injured thereby. In all cases like the present it is a question of prime importance, in determining the liability of the defendant, to ascertain whether the injured party was upon the premises at the time of the accident under a bare license or permission, or in pursuance of an invitation. Here the deceased must be regarded as having adopted this route in pursuance of an invitation held out to him by the conduct of the defendant company."

After citing the circumstances of the case, the court says:

"Under such circumstances, it seems to us clear that an obligation was imposed upon the company to see that it should not become a source of danger to those to whom it had held it out as a passage or way through which they might safely go, and a duty was imposed upon the company of notifying persons entitled or invited to use it, in some unmistakable way, that it was about to be closed before closing it. *Railroad Co. v. Fitzpatrick*, 35 Md. 38; *Gillis v. Railroad Co.*, 59 Penn. St. 129; *Kay v. Railroad Co.*, 65 Id. 269."

In the case of *Iron Co. v. Giles*, decided in the supreme court of Delaware, and found in 11 Atl. Rep. 189, it is stated that the general rule is that, while the owner of real estate is not bound to provide safe-guards for wrong-doers, he is bound to take care that those who come upon his premises by express or implied invitation be protected from injury resulting from the unsafe condition of the premises, and from other perils and accidents which the invited party had no reason to look for. In applying the rule to the question then before the court, it was said:

"But the question of contract may be put entirely aside from the case, and the responsibility of the master may be planted on the same ground which would render him responsible if the relation had not existed. Whether invited upon the premises by the contract of service, or by the calls of business, or by direct request, is immaterial; the party extending the invitation owes the duty to the party accepting it to see that at least ordinary care and prudence is exercised to protect him against dangers not within his knowledge, and not open to observation."

In the case of *Railway Co. v. Barnhart*, 115 Ind. 399 (16 N. E. Rep. 121), which was a case where two switch tracks ran across a railroad track of another company, and through a defective crossing an engine left the track and injured the plaintiff, an engineer upon the other track, the court said:

"It is true, as contended, that the owner of premises is under no legal duty to keep them in good repair for the accommodation of persons who go upon them for their own convenience merely. Where a person has a license to go upon the grounds or the inclosure of another, he takes the premises as he finds them, and accepts whatever perils he incurs in the use of such license. But when the owner or occupant, by enticement, allurement, or inducement, whether express or implied, causes another

to come upon his lands, he then assumes the obligation of providing for the safety and protection of the person so coming, and for any breach of duty in that respect such owner or occupant becomes liable for any injury which may result to the person so caused to come onto his lands. The enticement, allurement, or inducement, as the case may be, must be the equivalent of an express or implied invitation. Mere acquiescence in the use of one's lands by another is not sufficient. Such an implied invitation may be inferred from some act or line of conduct or from some designation or dedication;" citing, in support of the general doctrine, a long line of authorities.

It is further contended by counsel for defendant that the defendant is not liable for the injury caused by the breaking away of the stringers of its bridge unless it had previously been notified or was aware of its unsafe condition. We do not think that actual notice or knowledge was a prerequisite to the liability of defendant. The duty imposed upon it, under the circumstances, was that of exercising ordinary care to see or ascertain the condition of the bridge, and the circuit judge quite fully covered this aspect of the case in the following instructions, viz.:

"If the crossing was reasonably well constructed, the next question will be this: Was it permitted to become unsafe through the negligence of the railway company? Negligence, gentlemen, is the omission to do something which a reasonable person, guided by those considerations which ordinarily regulate human conduct, would do, or the doing of something which a reasonably prudent person would not do. In other words, one who fails to use the care and caution ordinarily used under like circumstances by reasonably careful and prudent persons is negligent. In this case, was the defendant reasonably careful and prudent in caring for the crossing in question after its construction? So long as the bridge remained standing, and so long as the gates were not nailed up or otherwise permanently closed, or no notice given of imperfection in the bridge, it was the duty of the railway company to have kept it in reasonably good repair, considering the place at which it was situated

and the uses to which it might naturally and reasonably be put. It is not necessary, as suggested by counsel, for a railway company to keep men in constant attendance upon or in watch over a bridge, nor to take extraordinary care of one. It is, however, required to be reasonably careful. Now, then, considering the age of the bridge, its manner of construction, the character of the stringers and sills, the ordinary life of similar kinds of timber, the use to which it has been subjected, and any and all other facts in evidence pertinent to the question, it is for you to find whether the railway company was or was not reasonably vigilant or careful in the premises, and whether it did or did not act as a reasonably prudent person would have acted under like circumstances."

Several exceptions are taken to the charge of the court as given upon his own motion, but the only ones which are well taken are those which refer to the following portion of the charge of the court.

"If the company had removed the bridge in question, while the land-owner could have compelled it to furnish another crossing, the company could not be compelled to pay damages for an injury sustained on a bridge built by the farmer himself, or by some other person not connected with the railway company, unless, perhaps, the bridge so constructed had been permitted to stand so long by the company that it might reasonably be inferred that it had confirmed the act of building the bridge, and thus have made the bridge its own, or, at least, have made itself liable for any damages directly occasioned by the bridge. If the bridge had been removed by a freshet, and a new one had been constructed by some person not connected with the railway company, the rule would be the same as in the case of actual removal of the bridge at the instance of the company. In this case, however, the evidence does not show that all the stringers were removed at the time of the freshet, and, such being the case, the rules just referred to are not applicable. If a farm-crossing bridge is weakened by a freshet, or if it becomes unsafe or out of repair through any other cause, and if the exercise of reasonable care by the railway company will avoid accident to one lawfully using it, the company will be liable, provided that such person be free from negligence himself, as already indi-

cated. Therefore, in this case the question is this: Was the company reasonably careful in the premises to avoid accident on or at the bridge in question?"

I confess that this portion of the instructions of the learned judge is involved in uncertainty, if not in obscurity. The first portion quoted, so far as it relates to the question that, had the bridge been removed, the company could not be compelled to pay damages for an injury sustained on a bridge built by the farmer himself, or by some other person not connected with the railway company, is undoubtedly correct. But the succeeding clause, in which he told the jury "unless, perhaps, the bridge so constructed had been permitted to stand so long by the company that it might reasonably be inferred that it had confirmed the act of building the bridge, and thus have made the bridge its own, or, at least, have made itself liable for any damages directly occasioned by the bridge," does not appear to be applicable to the facts elicited from the testimony introduced in the case. It was correct to instruct the jury that if the bridge had been removed by the freshet, and if a new one had been constructed by some person not connected with the railway company, the rule would be the same as in the case of actual removal of the bridge at the instance of the company. In neither of these cases would the company be liable to any one passing over the bridge, unless the company had by some further act, as by placing plank between the rails of its track, induced or invited persons to cross the track at that point. What the learned judge meant in his instructions that, "in this case, however, the evidence does not show that all the stringers were removed at the time of the freshet, and, such being the case, the rules just referred to are not applicable," does not to me seem clear.

Neither would it be correct in this case to say that,—

"If a farm-crossing bridge is weakened by a freshet, or if it becomes unsafe or out of repair through any other cause, and if the exercise of reasonable care by the railway company will avoid accident to one lawfully using it, the company will be liable, provided that such person be free from negligence himself, as already indicated. Therefore, in this case the question is this: Was the company reasonably careful in the premises to avoid accident on or at the bridge in question."

This appears to me to be also misleading. An equally important question which preceded the one which he stated to the jury was, had the company, by erecting the bridge at the point indicated, kept up and maintained a crossing over its track, including the approaches, by way of the bridge described in the testimony? As was stated in our opinion when the case was before us upon the first hearing:

"It was a structure built upon its own land, and, by its nature and use, was a continual invitation to those lawfully having a right to cross from one side to the other at that place to enter upon it, and cross there; and so long as this invitation, thus impliedly given to such persons, continued, it was the duty of the defendant, independently of any contract, to see to it that it was safe for the purposes implied by the invitation."

It was not a question of legal obligation of the company to maintain the bridge, but of the fact whether or not it did maintain a crossing at that point; and if the jury found that it did, then it was bound to the exercise of reasonable care to maintain a safe crossing,—that is, such a crossing as would be reasonably safe for the purposes intended by its erection. We are not sure that the jury, under the instructions above quoted, may not have lost sight of the question whether or not the company did in fact maintain a crossing at this point, including the bridge and the planking between its rails, and the gates through which persons desiring to cross might enter. Certain it is that if the bridge had been

washed away by a freshet, and was not at the time replaced, and to all appearances safe, the plaintiff could not recover, even though the stringers had not been removed by such freshet.

The judgment must be reversed, and a new trial ordered.

The other Justices concurred.