MINOR v. ESCANABA LUMBER CO.

1. Negligence — Railroads — Lumbering Railway — Licensees on Track.

Under testimony tending to show that plaintiff was the wife of a contractor engaged in cutting timber for defendant, a corporation owning a private railway that it used for the purposes of its business; that the contractor was permitted by the company to use a hand car on defendant's road to go to and from defendant's store in purchasing supplies; that while he and plaintiff were going from their lumber camp to a neighboring village for their private convenience on a dark night, they were struck by a train of defendant running without lights, and no whistle was blown or bell rung or other warning given, the plaintiff was a mere licensee in the use of the track, and the evidence did not support the theory that the plaintiff was invited to use the car and track.

2. Same.

There was a different duty to a mere licensee than would be required of defendant in behalf of persons invited to use the track, so that a charge to the jury imposing on defendant the duty towards an invited person was improper.

Error to Mackinac; Shepherd, J. Submitted June 21, 1911. ( Docket No. 37.) Decided November 3, 1911.

Case by Mary E. Minor against the Escanaba Lumber Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*Frank D. Mead,* for appellant.

*Henry Hoffman* (*J. J. Brown,* of counsel), for appellee.

Blair, J. Plaintiff brought suit against the defendant for personal injuries received by her on the 3d day of November, 1909, while riding on the logging railroad of the defendant on a hand car owned and controlled by her

husband, David Minor; the car colliding with a train which was backing out of Bryan.

It appeared that in the winter of 1905–06 David Minor had acted as a jobber for the defendant company, and was so employed at the time of the accident. He was not an employé of the company, but was an independent contractor, getting out the material for the company at a specified price. He employed his own labor and furnished his own supplies, purchasing them from defendant company. He had a camp about two miles north of Bryan, the headquarters camp of the defendant company.

The defendant was a lumber company organized under the laws of this State, and owned and operated a logging railroad running south from Bryan to Pike Lake, where it connected with the Minneapolis, St. Paul & Sault Ste. Marie Railway Company, and north from Bryan to its camps. At the time of the accident, this railroad, together with its spurs and branches, was about 14 miles in length. The defendant was not a common carrier; it ran no trains on schedule time, and carried no passengers. The trains were operated entirely in its own business, carrying logs and pulpwood from its camps to Pike Lake, and from there the logs were taken by the Minneapolis, St. Paul & Sault Ste. Marie Railway Company and carried to the mill of the company at Masonville, Mich.

On the night of the accident, Minor, his wife, and two employés started for Bryan from the camp. It was a dark night. They were all pumping on the hand car; Mrs. Minor stood on the front of the hand car next to her husband, between the handle bars. They were facing south, towards Bryan. They had a lantern standing on the front of the hand car. When between 40 and 50 rods from Bryan, they collided with the train, which was going north; the engine backing up, shoving ahead of it 14 empty flat cars. There was no light displayed at the north end of the train, nor were any signals given of its approach. Mrs. Minor was thrown into the ditch and seriously injured. The train was getting under way

when the collision occurred.   Charles Case, the conductor and brakeman, was about the middle of the train of 14 flat cars, walking toward the forward end of the train with his lantern.   He intended to stand on the end of the car with this lantern, but before he reached the front end of the train it had collided with the hand car, between 40 and 50 rods north of the store.   The train was moving north at the rate of from six to eight miles an hour.   Plaintiff testified that the hand car "was running pretty fast; as fast as we could propel it.   We could pump it, I think, about eight or ten miles an hour."

Her husband testified:

" I let the car to other people.   Any one that came there and asked for the car, I let them have it, and they didn't pay anything for it."

Mr. Minor testified as to the hand car:

" The hand car was purchased by the company for me, charged to me, and paid for by me.   *   *   *   The hand car was got for what we wanted to use it; there was nothing said about it.   When they got the hand car for me, there was nothing mentioned; it was got to get supplies, or whatever we wanted to use it for.

"*Q.* Nothing was said about it one way or the other?

"*A.* Nothing was said as to what we wanted to use it for; we used to have some kind of a road—some kind of a tote road.   I used the hand car and my employés used it. I lent it to a lot of people around there.   *   *   *   The reason why I told Mr. Coyne I wanted to get a car was so that I could get my supplies in there.   I took a lot of supplies in on the car.   The only talk I had was with Mr. Coyne and Mr. McEwen.   The first talk was with Mr. Coyne.   The talk I had with Mr. McEwen was when the car was ordered.   I didn't talk with Mr. Hopkins about the car at that time.   All the trouble I had in getting my supplies was that they didn't run up there every day, and I couldn't get fresh meat.   The engine didn't run up there every day.   Whenever they ran up, they took supplies for me on the engine, but in the summer time we couldn't get fresh meat when we wanted it, so when we got the car we could run down and get 40 or 50

167 MICH.—28.

pounds of fresh meat, or something. We usually ran the car after working hours; whether it was daylight or not, it depended. It would be after 6 o'clock. When the days were short, it was dark after 6 o'clock. We didn't very often go down in the daytime, because we had nobody to run the car. * * * We were pumping about as fast as we were able to pump it. The car was going at a fair speed; I don't know how fast it was going. We had our eyes pealed to see what we could see ahead of us. The lantern stood on the platform of the hand car. It was just a common lantern; there was no reflector on it to throw the light ahead on the track; if there had been, we could have saved ourselves. * * *

"*Q.* You were asked if this hand car was not purchased for your own convenience, and you said, 'Yes.' Now, what do you mean by your own convenience?

"*A.* Why, it was for both of us.

"*Q.* What do you mean by 'both of us'?

"*A.* The company and me; the company bought that car to save them from running up there with their train. The company ran their trains up there for my convenience; there may not be anything in the contract requiring them to deliver the supplies at my camp, but they agreed to do it. I bought the supplies at their own store. Sometimes they wouldn't send them up on the engine; sometimes I carried them up myself, and that is the reason I got the car. It was a saving to the company to carry these supplies up on the hand car. They ran up there especially to carry supplies. There was no road there; there used to be a tote road at one time, but not then. * * * I got the hand car for to haul supplies; whenever we went for supplies, we got the mail. I don't talk very good English, and maybe I don't understand what the word 'convenience' means. * * *

"*Q.* Now, that is all the hand car was used for, anyway?

"*A.* That is all it was used for.

"*Q.* For getting your supplies and mail?

"*A.* Getting the mail, and whenever we felt like putting it on the track to go to Bryan, why we went, even if there was no mail to bring up. * * * I didn't tell Mr. Bowman that I didn't blame anybody, or that I should have been more careful. I told him that I didn't want to go, but went to please my wife, because she wanted to go to church."

Mr. Coyne, superintendent of defendant's work in the woods, testified for plaintiff:

"Minor's camp was about two miles north and west of Bryan; he put his material out on the railroad; his camp was close to the railroad. When he went in there, he had some trouble in getting supplies; he moved them in on wagons, and for that reason he asked me if he could have a hand car to take his supplies in, and then I told him that I would have to see Mr. Hopkins. Mr. Hopkins said he thought it would be all right. I don't know what else took place; I don't remember that I told Mr. Minor what Mr. Hopkins said; I don't remember of talking the matter over with him again.  *  *  *  It was customary to drop a car on the track; to leave cars on the line to load at certain places back and forth; and they left cars standing around on the main line at Bryan, or near there. I have seen their tracks all filled in with cars. It was customary to have a good many cars standing around Bryan, and north of Bryan a short distance, at night."

Plaintiff testified:

"I have been at the camp a good deal in the last five or six years. I have seen them shoving trains of cars back and forth on this railroad, and at any time we were on the track with our hand car and saw the train coming we got off the track. They always shoved the cars ahead of the engine in going with the empties north to the camps from Bryan. I knew that there was no regular time for the train to come; that they didn't have any schedule time. I knew that the train was used by the company for carrying the company's logs. I was listening for the train. I didn't know at that time that they were switching cars at night 40 or 50 rods north of Bryan, and moving trains at night; I didn't know it when I was hurt last November.  *  *  *  We were going to church at Bryan, and I was standing up and pumping the hand car, looking right toward Bryan and watching out for the train, and I was listening to see if we could hear the train coming. We did not hear it; we had no warning whatever. We did not see any lights; there were no lights on the train. I didn't hear any whistle blown. The train was right on us before we ever saw it."

Mr. Minor testified:

"My camp was right close to the track. I knew how the company ran their trains; the engine would be backing up with the cars ahead of it. It would shove the cars ahead of the engine, taking the empties back to the camps, then running the loaded cars behind the engine back south to Bryan; that was their method of operating; they came at any time they saw fit. They didn't have any regular schedule of time for running; once in a great while they would drop a car anywhere on the road, leaving it standing there. Sometimes when we would come down with the hand car in the daytime we would have to carry our hand car around the car. Sometimes they did switching at Bryan in the nighttime, and sometimes they didn't; they done a lot of it in the evening, and they generally took a loaded train of cars down to Pike Lake, to be shipped on the Soo Line, generally after supper, and then they would bring the empties back, and would leave them there at Bryan until next morning. Once in a great while they would take the cars back to the camps at night, but not every night. This night we came down to go to church; that was the only reason we went for; that and to get the mail."

The declaration avers that it was—

"The duty of the defendant to drive and operate said locomotive engine in backing up said flat cars as aforesaid upon said railroad with great care, caution, and diligence, and at dark, and during the continuance of such a condition, then and there to show or display a light on said train of flat cars as a signal of its approach, and to blow a whistle or ring a bell, and to give warning of its approach, and keep a lookout or watch for other cars operating upon and along said railroad."

The violation of the duty is averred as follows:

"* * * Not regarding its duty in that behalf, but negligently and carelessly failed to show or display any light upon said train of cars as a signal of its approach, and negligently and carelessly failed to blow any whistle or ring a bell, or give any warning of its approach, and negligently and carelessly failed to keep a lookout or watch for other cars operating upon and along said track, and did by its servants then and there so carelessly and negligently cause the said locomotive engine which was then and there backing up said long train of flat cars

attached to said locomotive engine, to wit, 14, to be driven along and upon the track of the said defendant's railroad; that the said train of cars then and there struck with great force and violence the said hand car," etc.

At the close of plaintiff's case and again at the close of the whole case, defendant's counsel moved for a directed verdict. The motions were denied, and the case submitted to the jury, resulting in a verdict and judgment for plaintiff for $4,000.

The court instructed the jury, among other things, as follows:

" It is the theory of the plaintiff that the use of the hand car, and as the testimony shows it was used, under the circumstances as shown by the testimony, was invited by the defendant, and it was the duty of the defendant to keep the way reasonably safe for those who should ride on the hand car, as shown by the testimony, upon the principle that such safeguards are due to invited persons. And if you find from the testimony that that hand car was used by the plaintiff on the night in question in the way claimed by her, and her injury was occasioned by the negligence of the defendant, and there was no fault or negligence on the part of the plaintiff or her husband, the plaintiff is entitled to recover for the injuries sustained."

This instruction is made the basis of the twelfth assignment of error. This instruction was not qualified in any other part of the charge, and contains all that was said as to the legal relations of the parties at the time of the accident. The jury would naturally understand from the language used that the court adopted the plaintiff's theory that plaintiff was using the hand car at the time of the accident by invitation of the defendant, and that they were to determine defendant's negligence upon the theory that it was the duty of the defendant to keep the way reasonably safe for those who should ride on the hand car. There is no evidence in this record of an express invitation to use the hand car for any purpose. Assuming that the testimony justifies an inference of an implied invitation to use the hand car in purchasing supplies at the defend-

ant's store, or in other matters relating to their business affairs, such invitation would not authorize plaintiff to use the car, as it was used on the night in question, for the mere private convenience of plaintiff and her husband. *Kinney* v. *Onsted*, 113 Mich. 96 (71 N. W. 482, 38 L. R. A. 665, 67 Am. St. Rep. 455).

The most favorable view for plaintiff that the testimony will admit of is that, in the use of the car which she was making at the time of the accident, she was a mere licensee, to whom the defendant owed a different duty from that which would rest upon it in case she had been invited to use the car and track. *Stewart* v. *Railway Co.*, 89 Mich. 315 (50 N. W. 852, 17 L. R. A. 539).

The judgment is reversed, and a new trial granted.

BIRD, MOORE, MCALVAY, and BROOKE, JJ., concurred.