[No. 3392, 3393.]

GREAT WESTERN SUGAR CO. AND COLORADO AND SOUTHERN RAILWAY CO. v. PARKER.

1. APPEALS—*Separate—Consolidation of.* The action of the supreme court in consolidating appeals, while pending in that court, will in the court of appeals be regarded as final.   •

2. PLEADINGS—*Waiver of Objections by Answer.* All objections to the complaint, except that it fails to state sufficient facts, waived by an answer to the merits.

3. ——. *Construction.* The complaint is to be taken in its entirety and receive a liberal construction.

A complaint against a manufacturing company and a railway company, for negligence in constructing, maintaining and operating trains upon a switch track, within the premises of the manufacturing company, with poles set in such proximity thereto as to endanger the lives of those operating the trains, and charging the death of a brakeman, occasioned by reason thereof, held to state a joint cause of action against the two corporations.

4. —— *Allegations Not Proven*, and eliminated by instruction from the consideration of the jury will not be regarded in construing the complaint.

5. MASTER AND SERVANT—*Master's Duty as to the Place of Work.* The master is bound only to ordinary care to make the place where the servant works reasonably safe.

But he is under this duty even where the place of the servant's employment is upon the premises of another.

The master may be presumed to be informed of a condition of his premises involving danger to the servant there employed, where such condition has existed for a time sufficient to enable the master, or his servant charged with his duty in that behalf, to have learned of the danger and· corrected the defect, by the exercise of reasonable care.

But the master is not under an absolute duty in this respect.

In an action against a railway company for the death of a servant, attributed to alleged defects in the place of employment,

an instruction that it was the duty of the defendant "to provide for its employes a reasonably safe place to work," was held error.

6. —— *Duty to Servants of Another Master.* A manufacturing company which maintains in its premises railway tracks where by its request and invitation a railway company switches cars, bringing freight to, and removing freight from, such premises, is under duty to the servants of the railway company to exercise reasonable care to make such premises reasonably safe for their use.

7. —— *Servant's Assumption of Risk.* The servant assumes the risk of injury from defects and dangers in the place of his employment, not only when they are ordinarily incident to the work, but extraordinary defects and dangers, of which he is, by any means informed, or which are so patent and obvious as to be readily observed, and the danger of which he understands and appreciates.

The negligence charged against the master in respect of such defects, the obviousness of the danger, and whether the servant knew of it, are questions for the jury.

8. NEGLIGENCE—*A Question for the Jury.* Only in a very clear case should the court charge that a given state of facts is negligence in law. In an action against a manufacturing company and a railway company, charging joint negligence in erecting and maintaining upon the premises of the former a pole in such proximity to certain railway tracks as to endanger the lives of those operating cars thereon, and the operation and switching of cars thereon by the railway company at the request of the manufacturing company, occasioning the death of a brakeman, it was held that the evidence did not justify a charge that the erection of the pole, or allowing it to remain in such proximity to the track, was negligence *per se*.

The instruction was held especially injurious to the railway company in view of the undisputed fact that it had nothing to do with the erection of the pole, and there was no evidence of any right on its part to remove it.

Reference in the instruction to the fact that the pole was "not a necessary part of or an appliance or convenience or connection in the use of the track," was held to plainly tend to the prejudice of the railway company.

9. INSTRUCTIONS—*Conflicting.* Where instructions conflict it is impossible to know by which the jury were controlled; therefore, instructions which are in direct conflict, one of which is false in law, constitute fatal error, even though the other is without fault.

10. —— *Invading the Province of the Jury.* An instruction which assumes to declare as matter of law, what is in fact a question for the jury, is fatal error.

11. APPEALS—*Error Presumed Injurious.* Where the instructions upon the controlling issue are in direct conflict, and the evidence in the record is such that it is impossible to say that the jury were not misled, prejudice will be presumed.

*Appeal from Larimer District Court.* HON. HARRY P. GAMBLE, Judge.

Messrs. DINES, WHITTED & DINES, Mr. C. W. WATERMAN, Mr. CALDWELL MARTIN, for appellants.

Messrs. FLEMING & AULT, for appellee.

WALLING, Judge.

Appellants were the defendants in an action brought by the appellee, as plaintiff, to recover damages for the death of appellee's husband, Dillard B. Parker, alleged to have occurred in consequence of the negligence of the appellants.

The complaint, after stating the relationship of the plaintiff to the deceased, and the incorporation and business of the defendants, alleged in substance: That on November 24th, 1906, the defendant sugar company owned and operated a plant and appurtenances for the manufacture of sugar. That a certain spur or side track connected the main line of the appellant railway company with the plant of the sugar company, which side or spur track was on the property of the sugar company, and was used by it for the purpose of receiving shipments of freight from, and delivering freight for shipment to the railway company; and for those purposes the sugar company directed and requested the railway company to come on and along the side or spur track, by its servants and employees, and with

its engines and cars, and pursuant to such direction and request the railway company did frequently enter on the side or spur track by its servants, agents and employees, and with its engines and cars. That the railway company, as a part of its business, for the purposes of delivering to and receiving from the sugar company shipments of freight for transportation over the former's railway, and providing and placing cars for such purposes, made use of the side or spur track as aforesaid. That along such side or spur track, the defendants erected, or permitted to be erected and maintained, a certain pole or series of poles, with iron spikes or bars projecting therefrom towards said track, which pole or poles were negligently erected, or permitted to be erected so close to said track, as to endanger the lives and persons of those operating the trains thereon, and were negligently and carelessly allowed and permitted so to remain by the defendants; and that said poles were negligently erected or permitted to be erected by the defendants, and by them negligently allowed to remain, at a point along said track where an embankment about three feet high sloped directly down to the edge of the track, and so as to endanger the lives of those operating trains over the track. That plaintiff's husband, Dillard B. Parker, on and prior to the date mentioned, was employed by the railway company as brakeman, and, on that date, by direction of the railway company, went upon the side or spur track, on a train of the railway company, engaged in performing his duties as brakeman. That in the performance of his duties, he was riding on the side of one of the cars, when he was struck by one of said poles, or a spike projecting there-

from, and thereby thrown under the train of cars and killed. There was the further allegation that the train, on which the brakeman was riding, was operated at a high and negligent rate of speed by the railway company's employees. Damage to the plaintiff was alleged, and the complaint concluded with the usual prayer for judgment.

The answer of the sugar company admitted that since February 28th, 1905, it had operated the plant and appurtenances for the manufacture of sugar, but denied that the business or plant was owned by it, or that it was interested in the same at any time prior to that date. It admitted that on November 24th, 1906, and prior to the twenty-eighth day of February, 1905, there was a spur or side track connecting with the main line of the railway company's railway, running to the sugar company's property and up to its plant and sugar factory, and that connected with the spur or side track were various other side tracks situated upon defendant's property; and that the defendant railway company used such tracks for the purpose of delivering shipments of freight to and receiving shipments of freight from the sugar company; and denied each and every other allegation of the complaint.

In the second defense of the same answer, it was alleged that said Dillard B. Parker was well aware of all the various structures mentioned in the complaint, and the location thereof in relation to the railroad tracks, and was well aware of all the dangers incident to his employment, at all times and places mentioned in the complaint, and assumed the risks of his employment with respect to such structures and tracks.

A third defense alleged contributory negligence on the part of the deceased.

The answer of the railway company admitted that it was the owner of and operating the railway mentioned in the complaint; and admitted the allegations with respect to the spur or side track connecting its line of railway with the premises and factory of the sugar company, for the purposes alleged in the complaint. It further admitted that Parker was employed by the railway company as a brakeman, and that he came to his death on the date alleged. The answer denied the other allegations of the complaint. In a separate defense, the answer alleged that deceased was warned of the existence of various structures, including poles, at different places such as might endanger life and limb, and as a condition precedent to his employment he agreed to familiarize himself with the location of such dangerous structures and obstacles; and that, if the accident was caused as alleged in the complaint, it resulted from conditions with which the deceased was required by his contract with the railway company to familiarize himself, and that he had had sufficient time and opportunity to do so. Other defenses pleaded assumption of risk by the deceased, and his contributory negligence.

Prior to answering the complaint, the appellant sugar company filed a motion, and afterwards a demurrer to the complaint, which were overruled in turn. The plaintiff replied to the answers of the defendants, denying the new matters alleged therein. Before entering on the trial, the sugar company interposed a motion to require the plaintiff to elect as between two supposed causes of action contained

in the complaint, which motion was overruled. The objection of both defendants to the admission of evidence under the complaint, for want of sufficient allegations to constitute a cause of action, was likewise overruled.

The following facts appeared from the evidence. The deceased, Dillard B. Parker, was employed by the railway company as a brakeman, on October 8th, 1906, and worked continuously in that employment until his death. During the two weeks immediately prior to his death, except four days when he was ill, Parker worked on the night switching crew then engaged in switching cars at the yard of the defendant sugar company, wherein its factory was situated. It was at the time of the greatest activity in the operations of the sugar factory, and the volume of freight handled for the sugar company was of such magnitude as to require the employment by the railway company of two switching crews for that purpose, one working in the day time and the other at night. The switching of cars to and from the factory was accomplished by means of the spur track, entering the sugar company's premises through a gate on the westerly side thereof. Other tracks in the sugar company's yard connected with the main spur, for the convenient placing of cars for loading and unloading freight. The main spur track, after it entered the factory yard, was known as the run-around track. It was originally laid at or about the time of the construction of the factory, and prior to the time when the sugar company acquired title to and ownership of the premises, which was in February, 1905. Prior to the acquisition of the sugar factory and premises by the appellant su-

gar company, its predecessor in ownership had constructed a system of flumes in the factory yard, for the purpose of conveying beets from the beet piles to the factory, and had established electric light poles, set in a line from northwest to southeast, parellel to and about thirty inches distant from the most northerly beet flume. These poles were so erected for the purpose of lighting the flumes, but it does not appear from the evidence that they were used for that purpose, or for any purpose, at the time to which this discussion relates. The track known as the run-around track was located north of this line of poles. At the time of the accident here involved, the distance between the most westerly pole and the center of the run-around track was ten feet and one inch, and between the most easterly pole and the center of that track was seven and one-tenth feet. The space between the most easterly pole and the south rail of the run-around track was four feet, six and a half inches.

The easterly pole mentioned was a timber six inches by six inches in dimensions, twenty feet in height above the ground, painted white; and there were climbing-spikes driven alternately in the south and north sides, the spike on the north side, toward the track, being about six feet above the ground, and projecting six inches towards the track. It appears that the distance between the center of the track and the most easterly pole was at one time about twelve feet; but just when the location of the track had been changed at that place does not appear. So far as the proof shows, it may have been moved before the appellant sugar company acquired the property. The ties and rails compos-

ing the tracks in the sugar company's yard were the property of the railway company, which laid the tracks and exercised control over them. As has been said, the two switching crews were kept by the railway company for the purposes of the sugar company's freight business, and were subject to the call of the agents of the sugar company for that purpose; and those crews were under the direction of the agents of the sugar company, with respect to the placing of cars on the different side tracks in the yard, for the purposes of loading and unloading, and the switching of cars to and from the yard. The sugar company had no authority or control over any of the railway company's employees except as stated, and had no power to discharge or supplant any of them. Whatever work was done on the spur and side tracks in the yard was done by the railway company, and not by the sugar company. There was some testimony that the sugar company paid the expense of repairing those tracks, or some part of it, and there was also direct and positive proof to the contrary.

On the night of November 23rd, 1906, the crew in which the brakeman Parker was working, consisting of engineer, fireman, conductor and two brakemen, went into the factory yard with a train of cars loaded with lime rock, which were placed on a track called the lime-rock track, connected by a switch with the run-around track. Thereafter the engine was coupled to four empty coal cars on the run-around track, and the train, consisting of the engine and the four coal cars, proceeded west on the run-around track out of the yard. Parker assisted in placing the cars on the lime-rock track, and

after that work was finished he was seen to walk away. This was about ten minutes before the engine and coal cars started out of the yard. When the train started west on the run-around track, the other brakeman of the switching crew, Tindall, stood at the rear end of the car next to the engine. The train was started upon a signal given by one McCorkle, a contractor with the sugar company, the signal being repeated to the engineer by the brakeman Tindall. The conductor and the two brakemen, as well as McCorkle, had lanterns, as the night was somewhat dark. The yard was not wholly dark, as there was an electric light on a pole near the lime-rock track, about one hundred and fifty feet distant from the easterly electric light pole above described, and there was a dim reflection from the lights in the factory, besides the head-light of the engine. When the train, consisting of the engine and four empty coal cars, started out of the yard, the rear of the last car was some five car-lengths easterly from the most easterly electric light pole above described. The conductor stepped upon the brake beam of the rear car; and just before doing so he saw two lanterns ahead of him, one near the engine and the other about midway between him and the engine, on the south side of the train. He could distinguish the form of a man holding the lantern nearest him, but could not tell who he was. After the train started, the conductor, from the position occupied by him, was unable to see the south side of the cars. The brakeman Tindall saw a lantern on the south side of the train, when it started, and after it had gone about a car length and a half, the lantern disappeared. No one saw Parker get on the train going

out of the yard, and no one had recognized him for about ten minutes prior to the starting of the train; and he was not seen thereafter, until, after the train had passed out of the factory yard, the rear car of the train was derailed, and the unfortunate man's body rolled out from under the car. This occurred at a point six or seven hundred feet from the pole, which had been called the most easterly electric light pole. The ground was covered with snow, and an impression in the snow was traced from a point just inside the factory gate for over five hundred feet to a point about three feet west of the easterly electric light pole mentioned. This impression was along the south rail, and on both sides of it, as if a body had been dragged along, and it terminated about three feet west of the easterly electric light pole, in an impression extending from two feet south to eighteen inches north of the south rail, appearing as if made by a man's body falling, or sliding or slipping down into the snow. The impression in the snow did not extend east of the pole. None of the witnesses heard any outcry; and no one realized that anything unusual had happened, until the conductor discovered the body, outside of the yard. An examination of the body, the next morning, disclosed that there was a mark on his right cheek, about the size of the print of a man's thumb, his right arm was broken in two places, and there was a gash or hole across the small of his back.

At the front end of each of the coal cars, on the south side, there was a grab-iron, at the height of about five feet above the rail, and attached to the bottom of the car, directly underneath the grab-iron, there was a stirrup or footrest. There was

no evidence as to the height of the stirrup above the track, or as to Parker's height, if he was riding, as assumed, on the side of one of the coal cars, with his foot in the stirrup—as to which, of course, there was no direct evidence. There was testimony to the effect that the side of the coal car would overhang the rail by about two feet, two and a half inches. The surface of the ground at the easterly electric light pole was eighteen to twenty inches higher than the rail. Parker's lantern was found about three feet west of that pole, and about five or six feet south of the south rail of the run-around track. It appeared from the testimony that, during the period of his employment with the switching crew, Parker had worked in all parts of the yard, from early in the evening until early in the morning; that this particular track, which ran past the electric light poles, was frequently used for the switching of cars, and entering and leaving the yard; that the coke bins adjacent to the track, as well as the switch connecting it with the lime-rock track, were some distance east of the most easterly of the row of electric light poles; and that, on the night of the accident, that pole, towering in the air, was easily seen at a distance of ten feet. It was shown that there were a number of structures and obstacles in different parts of the yard, including standpipe, coke bins, fencing of incline into coal chute, lime-rock piles, shed, etc., so close to the side tracks, as not to leave room for a man's body between the structure or obstruction and a passing car; and that the deceased brakeman was several times warned by other members of the switching crew, during the time he worked in the yard, that the yard was a danger-

ous place to work in, and he was admonished at different times to observe care and caution, as he appeared to be somewhat venturesome and heedless of danger. On two occasions he was warned by those working with him in the yard, that if he did not use more caution about his work, he would be killed. The engineer who worked with Parker on the switching crew during the week preceding the accident, testified:

"I told Parker that he was trying to work entirely too fast around the yards; that it was a very dangerous place, and that at the gait he was going, he would sooner or later get killed or hurt. I also told him he would have to use more judgment in getting on and off the engine, and that he was taking too many chances. I also warned the man about how close different things came to the track, especially down around the lower part of the yards back of the factory. He said that he was doing the best he could, but that he had just started in railroading. I told him he would better lay off from that position and get a daylight job around the place, if he was to work around there, so as to familiarize himself with the dangers of the place."

At the conclusion of the trial, the jury, having received the instructions of the court and retired to deliberate over their verdict, returned into court separate verdicts against the defendants respectively, the verdict against the railway company being exactly twice as much as that against its co-defendant. The verdicts were not received; but, after the court had stated to the jury that such separate verdicts were not permissible, and had given them some further advice as to their duties, the jury were again

permitted to retire. Thereafter a verdict was returned against both defendants jointly for a single sum. After the motion for a new trial, filed by each defendant, had been overruled, a joint judgment was entered against them for the amount of the verdict.

Separate appeals were prayed by and allowed to the defendants severally, and thereafter perfected. After the appeals were docketed in the supreme court, they were ordered to be consolidated, and motions made by appellee to dismiss them were denied by the court. This action of the supreme court must be regarded as the final adjudication of the objections urged by counsel for the appellee, in their brief and oral argument, touching the regularity of the appellate proceedings and the jurisdiction of the court to review the judgment.

With respect to the errors assigned by the sugar company upon exceptions to rulings affecting the pleadings, all objections of the appellant in that particular were waived by the filing of the answer, except the objection that the complaint did not state facts sufficient to constitute a cause of action. That the allegations of the complaint, if sustained by evidence, sufficiently stated a cause of action against both defendants, we do not think admits of serious question. What will be said hereafter with respect to the law governing the case will cover the objections to the sufficiency of the complaint. The ruling on the motion to require an election by the plaintiff calls for no extended discussion. The motion was based upon the theory that the complaint undertook to state two causes of action in one—to-wit, a cause of action against both defendants jointly, and one against the railway company alone. The

criticism involved in the motion was highly techni-
cal, and is met by these considerations:  (1) It was
the duty of the court to liberally construe the com-
plaint as an entirety, and so construed, it was prop-
erly held to state a single cause of action against
both defendants.  If in fact the negligence of both
defendants combined to cause the injury as alleged,
the action was properly brought against them joint-
ly, although the same legal theories did not apply in
determining the negligence of each.  (2) By going
to trial against both defendants, the plaintiff elected
to proceed against them upon a joint cause of ac-
tion.  (3) The supposed duplication of causes of ac-
tion arose from the allegation at the end of para-
graph eight of the complaint, which charged that
the train was being driven at an excessive and neg-
ligent rate of speed.  No evidence was introduced
in support of such allegation, and it was expressly
eliminated from the case by an instruction given by
the court.

In submitting the cause to the jury, the court
instructed them as to the law of the case, in thirty-
seven separately numbered instructions—or rather
thirty-six, since instruction numbered thirty-seven
was the usual admonition, that the instructions
should be considered as a whole.  Errors in those
instructions are alleged in several assignments of
the appellants, and it is believed that the correct
decision of the case hangs upon the validity of the
instructions challenged.  By instruction numbered
four, the jury were charged "that it is the duty of
the Colorado and Southern Railway Company to
provide for its employes a reasonably safe place to
work.  Actual ownership of the place wherein it

sets its employes to work is immaterial, so that such place is used by it in its business, and that this duty is to be performed in view of the nature and character of the work to be done." Error is assigned upon an exception to this instruction by the appellant railway company. The evident conclusion from the instruction was that, if the railway company had failed in the performance of its duty as therein defined, it was actionable negligence on its part.

The law of this state is in no uncertain condition, upon the decisions of our appellate courts, respecting the measure of the duty of the employer as to places and appliances, where and by means of which an employee is to perform the work incident to the particular employment. A brief *resume* of some of the numerous decisions of our courts bearing upon this subject will be sufficient for the purposes of the present discussion. Upon a full consideration of the authorities, it was ruled in *Colorado Central R. R. Co. v. Ogden,* 3 Colo., 499 (*l. c.,* p. 502): "The master impliedly (if not expressly) contracts to use ordinary care and diligence * * * in the selection of * * * safe * * * machinery and appliances, and is liable for his own negligence in these respects."

In the same case it was further said (at page 510): "The company must use all reasonable precautions and care to secure the safety of its employees by keeping the roadway in repair. It cannot through want of watchfulness expose them to unreasonable risks in this respect, and escape liability, but the duty imposed is that of ordinary care. This ordinary care must be measured by the danger

of the service, proportioned to it. Considering the dangerous force which a railway company puts in motion, the term 'ordinary care toward its employees' imposes, without doubt, a high degree of diligence in keeping the road and all its appliances in proper repair, but it neither warrants nor insures against defects."

Mr. Justice Helm, speaking for the court in *Wells v. Coe,* 9 Colo., 159, said:

"*First.* In the purchase of safe machinery and appliances for use in his business, the master is required to exercise ordinary care and diligence; such care and diligence having reference to the hazards of the employment, and being proportioned to the dangers of the service. If, through the want of ordinary care in this respect, unsafe or defective machinery is procured, and the servant, without fault on his part, is thereby injured, the master is liable. *Colorado Cent. R. R. v. Ogden,* 3 Colo., 499; Beach, Neg., sec. 123.

*Second.* The master is likewise charged with the further duty of maintaining in suitable condition the machinery and appliances used in his business. In this regard he is also required to exercise ordinary care and diligence, and is liable for injuries, resulting from his ordinary negligence, to the servant, without fault on the latter's part; the question as to what shall constitute such ordinary care having reference likewise to the danger which the service naturally imposes upon the employee. *Hough v. Railway Co.,* 100 U. S., 213; Beach, Neg., sec. 124."

In a subsequent case, it was said:

"Tenney was engaged in a dangerous occupa-

tion; he was working for the interest and profit of his employers; it was their duty, therefore, to exercise reasonable care and diligence in providing for his safety while thus employed. This duty included the exercise of reasonable care in procuring and keeping in repair the machinery and appliances by which their employees were to be carried to and from their work in the bowels of the earth. See *Wells v. Coe,* 9 Colo., 161, and cases there cited; also 2 Thompson on Negligence, 972." *Moffatt v. Tenney,* 17 Colo., 189.

In *Carleton M. & M. Co. v. Ryan,* 29 Colo., 401, the court said:

"As applied to the conditions proper to consider in this case the law is, that an employer is required to exercise ordinary care in providing a reasonably safe place for his employees to work in."

"It is the duty of the master to exercise ordinary care in seeing that his servants are provided with a reasonably safe place in which to work, and that the instrumentalities and appliances to be used by them are in a reasonably safe and suitable condition." *Roche v. D. & R. G. R. R. Co.,* 19 Colo. App., 204. (Thompson, Judge.)

The following language was used in *Williams v. Sleepy Hollow M. Co.,* 37 Colo., 62:

"The employer must exercise ordinary care to provide a reasonably safe place in which the employee may perform the services required of him. It is his duty to use diligence to keep his place in reasonably safe condition so that the servant may not be exposed to unnecessary risks. The care and diligence required differ as circumstances differ, but in all cases it is such as a reasonably prudent man

would exercise under like circumstances in order to protect the persons of his employees from destruction or injury." See also *D. & R. G. R. R. Co. v. Warring,* 37 Colo., 122; *Kent Mfg. Co. v. Zimmerman,* 48 Colo., 388, 398; *Portland G. M. Co. v. O'Hara,* 45 Colo., 416; *Rice v. Van Why,* 49 Colo., 7; *C. F. & I. Co. v. Gardner,* 121 Pac., 680.

In other jurisdictions, instructions substantially similar to the instruction numbered four quoted above have been held to be erroneous, and sometimes fatal to the verdict. *Anderson v. Nor. Pac. Ry. Co.,* 34 Mont., 181; *Hughley v. Wabasha,* 69 Minn., 245; *C. B. & Q. R. Co. v. Oyster,* 58 Nebr., 1; *Choctaw etc. R. Co. v. Holloway,* 114 Fed., 458.

In *Portland G. M. Co. v. O'Hara, supra,* an instruction, commencing with the statement that "it was the duty of the defendant to furnish a reasonably safe place in which the plaintiff was required to work," contained the further direction that, if the jury found from the evidence "that the uncovered condition of the shaft and set screws was dangerous to those working in the screen room in discharging their duties, and that it could have been covered so as to render it safe to those working in said screen room, then it was negligence on the part of the defendant to leave such shaft and screws uncovered;" and it was ruled that the instruction, as a whole, was error for reversal, under the prior decisions of our courts, which were cited in the opinion.

In the present case the court further charged the jury, in instruction numbered six, as follows:

"The jury are instructed that the erection of a pole, or allowing a pole to remain, after the presence

thereof should have been known, by the exercise of reasonable care, which pole is not a necessary part of or appliance or convenience or connection in the use of the track, in such close proximity, and at such a place along said track as to be dangerous to the employes of the defendant, The Colorado and Southern Railway Company, is negligence *per se.*"

It seems that it must be a very clear case that would justify an instruction to the jury that a certain state of facts constituted negligence *per se*—that is, negligence in law, where the facts are to be tested by the variable standard of ordinary care, depending upon oral testimony and the inferences to be drawn therefrom.

"The existence of negligence should be passed upon by the jury as any other fact, and it is improper to instruct that a certain fact or group of facts amounts to negligence *per se*, unless such acts are declared by law to be negligence *per se*, or are such as to induce an inference of negligence in all reasonable minds." 29 Cyc. L. & P., 645.

In *D. & R. G. Co. v. Burchard,* 35 Colo., 539, the court, denying the petition for rehearing, used this language (at page 562):

"We cannot declare as a matter of law that the location of the crane so as to bring the end of the arm within ten inches of the cab was negligent *per se.*   *   *   *   If it was unreasonably and unnecessarily near for the efficient operation of the appliance, there was negligence, otherwise not. As stated in the main opinion, the mere fact that it was dangerously near did not constitute *per se* negligence."

And in *Williams v. Sleepy Hollow M. Co., supra,* the court said:

"The ordinary care which the parties are to use in the discharge of their respective duties so varies with the situation of the parties, their knowledge or means of knowledge, the surrounding circumstances of each particular case, the measurement of which depends so much upon the knowledge and experience of practical men in practical affairs, that it has long been the policy of the law to submit the question of reasonable care to the judgment of a jury."

In this case, the exercise of ordinary or reasonable care by the railway company was not submitted to the jury. The instructions four and six, considered together, were far more prejudicial, from the standpoint of the railway company, than that condemned in *Portland G. M. Co. v. O'Hara.* The evidence was undisputed that the railway company did not erect the pole referred to, nor was there any proof that the company had any right to remove it or require its removal. It was evident that the pole, to use the language of the instruction, "*was not a necessary part of or appliance or convenience or connection in the use of the track.*" The poles were erected by the sugar company, for the purpose of lighting its beet flumes. Whether they were used for that purpose, in connection with the operations of the factory, at the time of the occurrence of the accident, or not, they were a part of the structures composing its plant, erected upon its own premises, not occupied by the railway company, and in no wise within the control or authority of the latter company, so far as this record shows.

The reference in the instruction to the obvious fact that the pole was not an appliance or convenience used in connection with the operation of the tracks, as constituting an element of negligence on the part of the railway company, plainly tended to the prejudice of the latter company. The effect of instruction numbered six was to advise the jury that, if the situation of the pole was such as to be dangerous to the railway company's employees, that was, of itself, a conviction of negligence; and this was error. See *Electric Ry. Co. v. Moore,* 113 Tenn., 531; *Moore v. Chattanooga etc. Co.,* 109 S. W., 497; *Dalton v. Receivers,* Federal Cases, No. 3550.

The facts of this case are easily distinguished from those, wherein obstructions were placed on or over premises owned, or occupied and controlled by a railway company, whether so placed by the company itself, or by another with or without its permission, in such a way as to endanger the company's employees in the operation of its road. In all such cases the railway company, if not originally responsible for the obstruction, had the power to compel its removal. See *Erslew v. Railroad Co.,* 49 La. Ann., 86; *Illinois Terminal R. R. Co. v. Thompson,* 210 Ill., 226.

We must not be understood as holding that the fact that the tracks of the railway company were laid in the premises of the sugar company, for the mutual business advantage of both companies, relieved the railway company from the exercise of the proper degree of care, in view of the conditions, and the nature and exigencies of the work to be done, to provide a reasonably safe place for the performance of the work by its employees. The ob-

jection to the instructions given, as bearing upon the question of the railway company's negligence, is that its duty was nowhere correctly stated, while the effect of the instructions under consideration was to make it an insurer of the safety of its employees engaged in that particular work. *Portland G. M. Co. v. O'Hara, supra.*

By instruction numbered ten, the jury were charged that if they found from the evidence that the defendant railway company "moved its tracks so close to said pole as to render its proximity thereto dangerous," then the said defendant was "responsible therefor." This instruction would not have been objectionable in the abstract, if the jury had been properly instructed as to the nature and extent of the responsibility of the railway company. It certainly did not tend to correct the errors in the instructions numbered four and six.

Error is assigned by both of the appellants upon their exceptions to instructions numbered fifteen and sixteen given by the court in charging the jury. Those instructions were as follows:

(No. 15.) "The jury are instructed that said Dillard B. Parker assumed only such risks as were ordinarily and reasonably incident to his employment, and as came within his knowledge, or should, because of their obviousness, have become known to him after he entered into the employment of defendant, The Colorado and Southern Railway Company, where he remained in employment after knowledge or after he should have had knowledge thereof, as stated."

(No. 16.) "The jury are instructed that said Dillard B. Parker, in entering into the employment

of the defendant, The Colorado and Southern Railway Company, assumed only the risks ordinarily and reasonably incident to the nature and character of the work he was to do.''

Instruction numbered thirty-two, given at the request of counsel for the railway company, was as follows:

''You are instructed that in entering upon his employment as a brakeman, the deceased assumed the risk of all dangers ordinarily incident to his work, and if he was assigned to work at an unusually or extraordinarily dangerous place, and was informed of said unusual or extraordinary dangers, or by any means learned thereof, and understood and appreciated them, said dangers became ordinary to said employment, and were likewise assumed by him, and if his death was the result of said dangers, the risk of which was assumed as hereinbefore defined, the plaintiff cannot, in any event, recover in this action.''

It is evident from reading these three instructions that all of them cannot embody a correct statement of the law of assumption of risk. By instruction fifteen, the jury were told that the deceased assumed *only* the risks *ordinarily and reasonably* incident to his employment, *and* which came within his knowledge, or should, by reason of their obviousness, have become known; and by instruction numbered sixteen, that he assumed *only* the risks *ordinarily and reasonably* incident to the nature and character of the work he was to do. By instruction numbered thirty-two, the jury were informed that the deceased assumed not only the risk of all dangers ordinarily incident to his work, but also unus-

ual or extraordinary dangers, if he was informed, or by any means learned of such unusual and extraordinary dangers, and understood and appreciated them. We are confronted, then, with a situation somewhat similar to that presented in the case of *C. & S. Ry. Co. v. McGeorge,* 46 Colo. 15, wherein the court said, in discussing certain instructions concerning the duties and liabilities of a common carrier:

"No argument is needed to show that they (the instructions) are in hopeless and irreconciliable conflict. * * * Both cannot be right. If the first is, then there was no prejudicial error in giving the latter, as it states a rule more favorable to the defendant than it was entitled to have. * * * On the other hand, if the first of said instructions incorrectly states the law, then the case must be reversed, because of the conflict between it and the true rule; for it is impossible to determine upon the doctrine of which instruction the jury acted, or by which it was governed, in reaching its verdict."

We need not go beyond the decisions of our own courts, to ascertain the law of assumed risk, applicable to the circumstances of the present case, and it would be manifestly improper to do so, for the purpose of searching for declarations of principles inconsistent with what appears to be the established doctrine of our supreme court. To attempt to review all of the decisions of our appellate courts upon the subject would extend this discussion to an unwarranted length; and attention will be called to only a few controlling expressions found in some of them.

In *Wells v. Coe, supra,* it was said:

"Where injury is suffered by an employee, through defects in the machinery and appliances furnished by his employer and used in the business, if the employee knew, or had means of knowledge equal to that of his employer, concerning such defects, yet continued in the latter's service, he cannot recover; provided no inducement, such as a promise to remove the defect, and thus remove the danger, led him to remain."

In *Harvey v. Mountain Pride G. M. Co.,* 18 Colo. App. 234, the following language is quoted from the opinion of the supreme court in *Denver Tramway Co. v. Nisbet,* 22 Colo. 408:

"Under these circumstances he (plaintiff) was precluded from recovering by the well-settled rule that an employee assumes *all the risks naturally and reasonably* incident to the service in which he engages, *and those* arising from defects or imperfections in the thing about which he is employed that are open and obvious, or that would have been known to him had he exercised ordinary diligence. By voluntarily continuing in the service with knowledge, or means of knowledge equal to his employer's, or any defect in the appliances or the machinery used, and without objection, or promise on the part of the employer to remedy the defect, the employee assumes all the consequences that result from such defect, and waives the right to recover for injuries caused thereby."

And in the recent case of *Kent Mfg. Co. v. Zimmerman,* 48 Colo. 388, 400, the rule sustained by our decisions was thus stated:

"As applied to this case, it may be said that an

employee accepts service subject to all of the risks naturally and reasonably incident to the employment in which he engages, and those arising from defects or imperfections in the machinery which he is employed to operate, that are open and obvious, or which he could have ascertained by the exercise of ordinary diligence.—*Denver Tramway Co. v. Nisbet*, 22 Colo. 408—and so it follows that where an employee suffers an injury through defects in machinery about which he is engaged, of which he knew, or should have known, or had means of knowledge equal to that of his employer, he cannot recover.—*Wells v. Coe*, 9 Colo. 159. In other words, *the employee assumes all the risks and perils usually incident to the service in which he engages, and included in such risks and perils are those which it is a part of his duty to ascertain by observation."*

Instruction numbered thirty-two appears to be clearly within the principle announced by the cases cited. On the other hand, the abstract principle stated in instruction numbered fifteen, as given, appears to be wholly without any support.

Instruction numbered sixteen was erroneous, in that, by the use of the word *only,* the application of the rule of assumption of risk was restricted to the very words of the instruction. It is a general rule that the employee does not assume risks caused or increased by the employer's negligence. And it has been said that the employee has the right to assume that the employer has not failed in his duty to use ordinary care to provide reasonably safe places and appliances for the performance of the work required of the employee. The principle, with its proper qualification, was stated in the opinion of the Su-

preme Court of the United States in *Choctaw etc. Ry. Co. v. McDade,* 191 U. S. 64, 68, from which the following quotation is taken:

"This rule is subject to the exception that where a defect is known to the employee, or is so patent as to be readily observed by him, he cannot continue to use the defective apparatus in the face of knowledge and without objection, without assuming the hazard incident to such a situation. In other words, if he knows of a defect, or it is so plainly observable that he may be presumed to know of it, and continue in the master's employ without objection, he is taken to have made his election to continue in the employ of the master, notwithstanding the defect, and in such case cannot recover."

In this instance, the alleged negligence of the defendants, as well as the obviousness of the alleged dangerous condition and presumption of knowledge on the part of the railway company's employee, were questions for the determination of the jury, under proper instructions. *D. & R. G. R. R. Co. v. Burchard, supra; Williams v. Sleepy Hollow M. Co., supra; Kent Mfg. Co. v. Zimmerman, supra.*

The conclusion is that the court erred in giving the instructions numbered fifteen and sixteen, and that such error was not cured by the conflicting and contradictory instruction, although the latter was correct in principle. *Colo. & Sou. Ry. Co. v. McGeorge, supra; Walsh v. Henry,* 38 Colo. 393, 398; *San Miguel etc. Co. v. Stubbs,* 39 Colo. 359, 366; *Anderson v. Nor. Pac. Ry. Co., supra; Stratton v. Ellison,* 42 Colo. 498, 516; *City of Boulder v. Niles,* 9 Colo. 415, 421.

The instructions which have been considered

related to the most important issues in the case, and the state of the proof was such as required the careful instruction of the jury, to enable them to arrive at a proper conclusion. In the condition of the evidence presented by this record, it does not seem possible to say that the jury were not misled by the erroneous instructions above indicated; and resulting prejudice must be presumed. *Denver etc. Co. v. Cowan,* 116 Pac. 136.

A few words may be added respecting certain objections particularly urged by the appellant sugar company. The court instructed the jury that that company "is presumed to have known of the proximity of the electric light pole to the track of the railway company at the time in question, regardless of whether it had actual knowledge thereof or not, provided the conditions then existing had been in existence for a sufficient length of time for the sugar company, or its agents, in the exercise of reasonable care on its part, to have learned thereof." It is difficult to see how the sugar company can reasonably complain of this instruction. So far as the evidence shows, the run-around track was in the same location at all times after the sugar company acquired the ownership of the premises. The testimony of some of its agents to the effect that they were not aware of the distance between the track and the easterly pole until certain measurements were made after November 24th, 1906, can hardly be regarded as overbalancing the presumption that the company was or might have been acquainted with the conditions existing upon its own premises, and which could have been ascertained by reasonable inspection. It will be borne in mind that the

railway company was not a mere license, which had laid the tracks for its convenience alone in the sugar company's yard; but the tracks were there pursuant to an existing business arrangement between the two companies, and the maintenance of the tracks, and the switching operations carried on by means thereof, were an important and necessary adjunct to the operations and business of the sugar company, as then conducted and carried on. The only portion of the opinion in *Watson v. M. & P. P. Ry. Co.*, 41 Colo. 138, which is germane to the situation here, is the quotation therein from *Bennett v. Railroad Co.*, 102 U. S. 577, wherein it was said:

"It cannot be pretended that Bennett, at the time he was injured, was, in any sense, a trespasser upon the premises of the company. Nor is this case, like many cited in the books, one of mere passive acquiescence by the owner in the use of his premises by others. Nor is it a case of mere license or permission by the owner, without circumstances showing an invitation extended, or an inducement, or, in the language of some of the cases, an allurement, held out to him as one of the general public. It is sometimes difficult to determine whether the circumstances make it a case of invitation, in the technical sense of that word, as used in a large number of adjudged cases, or only a case of mere license. 'The principle,' says Mr. Campbell, in his treatise on Negligence, 'appears to be that invitation is inferred where there is a common interest or mutual advantage, while a license is inferred where the object is the mere pleasure or benefit of the person using it.'"

It was not error to charge, as was done by the

instruction numbered twenty-eight, "that if the switching crew of which Dillard B. Parker was a member went into the yard of the defendant, The Great Western Sugar Company, at the invitation, express or implied, of said defendant, for the purpose of moving cars for the use, benefit, or convenience of said defendant, or for the mutual use, benefit, or convenience of both defendants, The Great Western Sugar Company was required to use reasonable care to see that the premises were reasonably safe to be used by said switching crew, including said Dillard B. Parker, for the purposes for which they entered said premises pursuant to said invitation,"—particularly in consideration of other instructions given, which were favorable to the sugar company, singling it out by name. See *Anderson v. Nor. Pac. Ry. Co., supra; John Spry Lumber Co. v. Duggan,* 182 Ill. 218; *Indiana B. & W. Ry. Co. v. Barnhart,* 115 Ind. 399, 408; *Foster v. Portland Gold Mining Co.,* 114 Fed. 613-614; 1 Thompson Com. on Law of Neg., §§ 978-979; 29 Cyc. L. & P. 451.

Comparison of instruction twenty-eight with numbers four and six indicates that the learned judge of the trial court intentionally distinguished as between the defendant companies, with respect to the standard of care, which measured the duty of each to the members of the switching crew working in the sugar company's yard. This was an erroneous view. The duty in either case was that of exercising ordinary care, in view of the nature of the work,—by the sugar company, to see that its premises were in reasonably safe condition for the necessary operations of the railway company therein, and by the latter company, to provide a reason-

ably safe place and reasonably safe appliances for the performance of the work by its employees.

Other assignments of alleged errors need not be considered, as the matters complained of may not occur on a retrial. By reason of the errors in instructing the jury, as herein indicated, the judgment is reversed, and the cause will be remanded for a new trial.                                     *Reversed.*